ETHEL SCULL, Appellant, v ROBERT C. SCULL, Respondent.

First Department, June 2, 1983

APPEARANCES OF COUNSEL

*Myrna Felder* of counsel (*Raoul Lionel Felder,* attorney), for appellant.

*Bernard Furman* of counsel (*Thomas Epstein* with him on the brief; *Epstein & Furman,* attorneys), for respondent.

OPINION OF THE COURT

FEIN, J.

During the course of a 30-year marriage, the parties, who separated in 1974, earned a reputation as patrons of the fine arts, amassing a valued collection of contemporary works of art. In addition to $1,300 per week in alimony plus health insurance and legal fees, the trial court in this action awarded plaintiff wife sole title to six identified works of art and the proceeds from the sale of a seventh. The trial court denied certain other relief requested, viz., a constructive trust to be impressed on all other art works acquired during the marriage, to which plaintiff asserted joint ownership; a claim for unjust enrichment stemming

from defendant husband's exercise of a proprietary interest in those works of art; claimed unpaid necessaries in the amount of $42,491.55; and a declaration that defendant holds certain real property in Warren, Connecticut, presently in his own name, as a constructive trustee for the benefit of both parties. Plaintiff appeals from so much of the judgment as denied this additional relief.

It is clear from the trial record that defendant was not a man of considerable financial means when he entered this union in 1944. In the early years of the marriage, while plaintiff was attending art courses, defendant embarked upon several unsuccessful business ventures. Plaintiff obtained financial assistance during this period from her father, who operated a small fleet of medallion taxicabs in New York City. After first balking at the offer, defendant entered his father-in-law's business in 1948. In six years the business expanded to the point where defendant was actively involved in its management and operation under a newly formed corporation, and by 1962 the fleet consisted of over 100 medallion taxicabs. The rolling stock was divided among various entities of a complex corporate structure, designed to minimize tort liability. Although all of these corporate entities controlled by defendant were ostensibly owned jointly by both parties, plaintiff left all the financial and management decisions to her husband, and never personally received a corporate dividend. In fact, she conceded that in all the years of their marriage she never signed so much as a tax return, and never even had her own bank account, leaving all these matters to defendant, notwithstanding the fact that her father continued to give them periodic gifts of cash, new taxicab corporations and a down payment on a house in Great Neck. Plaintiff's father eventually withdrew from active participation in the business with his son-in-law and moved to Florida. Until he died in 1969 he would make periodic visits to New York, at which time he would examine the books. Throughout, it was plain that the taxicab business, largely created by plaintiff's father, was a family business. The conclusion that the business at some point became that of defendant, without any interest of plaintiff in it, is without support in the record. It must be concluded that the income

of the business and the loans made on its credit to acquire the art collection were joint property of plaintiff and defendant.

A loan from the major operating corporation enabled the parties to purchase property and build a house in Kings Point. In 1962 the Kings Point house was sold and the parties moved into a magnificent apartment at 1010 Fifth Avenue in Manhattan. They also designed and built a summer home in East Hampton.

Throughout their years in New York City the couple attended art galleries and showings, and occasionally purchased minor works of art for their home. In 1958 they decided to become collectors of art in a formal sense, acquiring works of art at galleries in Paris and New York which they displayed in their Kings Point and East Hampton homes, or stored. By the time they moved to Fifth Avenue, the parties had become prominent figures in the New York City art scene, hosting parties and picnics, loaning parts of their collection to museums, and patronizing many of the new and upcoming modern artists of the day. The apartment, which was featured in major magazine articles, became a veritable gallery for the private showing of art at parties hosted for artists, authors, critics, museum curators and fellow collectors. The parties enjoyed a very high standard of living, and moved among the avant-garde of the world of modern art, recognized as among the great collectors of art in America. The income to maintain this living standard and to permit the purchase of art came, according to defendant, from loans and salary accumulations from the umbrella taxicab concern, Super Operating Company, which was, after all, also jointly owned by the parties, albeit not in name.

Although defendant handled all the business details concerning the purchases of new works, plaintiff points out that only she had formal training in this field. (Curiously enough, defendant admitted that he was color blind.) Consequently, decisions on new purchases and auctions were arrived at after joint consultation, although the financial arrangements were still left to defendant. Testimony of a number of witnesses at trial revealed that the parties were jointly recognized for their contributions to the world of

art. At one point, however, plaintiff suspected that defendant's investment in art had changed their status from collectors to dealers, thus prejudicing their standing among collectors in the community and her application for membership in the Junior Council of the Metropolitan Museum of Art.

Plaintiff began to have concerns about leaving all the family financial matters in defendant's hands after her father died, when she was told that the estate was smaller than she had anticipated. She questioned the authenticity of a power of attorney supposedly executed by her late father in defendant's favor, and denied ever relinquishing her rights to the proceeds of her father's life insurance policy, even though defendant tried unsuccessfully to introduce in evidence a purportedly notarized release to that effect. Defendant testified at trial that he often signed plaintiff's signature to documents — tax returns, loan documents, insurance papers, deeds of gift, etc. — and got so proficient at it that he later could not even distinguish between plaintiff's genuine signature and his own rendition of it. When the Connecticut property was being considered, the parties discussed the joint purchase in conjunction with the sale of the house in East Hampton. Plaintiff testified that she was surprised to learn, upon the parties' separation five years later, that her name was not on the Connecticut deed. Later, defendant successfully auctioned a portion of the art collection at Parke-Bernet for more than $2,000,000 (including a Jasper Johns double white map personally autographed "To Ethel", which fetched $240,000), and showed plaintiff a check for the initial payment, in the round sum of $1,000,000. When plaintiff remarked that the check was made out solely to defendant, he assured her that this was purely for tax purposes. The same answer was given by defendant to the question why he was listed in the catalog as the sole owner of the Scull collection for this — their third — auction at Parke-Bernet, when their previous two auctions (in 1965 and 1970) had listed their works as jointly owned.

Disputes began to arise as to ownership of certain paintings which had been purchased or received as gifts. The climax came in 1974, while plaintiff was still recovering

from a broken back suffered in Barbados three years earlier, when all the art work at the Fifth Avenue residence was removed to storage in order to facilitate redecoration of the apartment. When plaintiff went to the warehouse to view them, she learned that they had been removed to another warehouse, where defendant had left instructions to deny plaintiff access. Plaintiff alleges that defendant's abandonment of her dates from this time.

After the parties separated, plaintiff charged that defendant had fraudulently borrowed on a life insurance policy owned by her, that defendant disposed of taxicab companies supposedly half owned by plaintiff, and in general, that defendant sought to have plaintiff squeezed out of the art world's limelight. Apparently all of these maneuverings were unknown among the art aficionados, many of whom testified as to what a wonderful "team" the parties made in their artistic endeavors — plaintiff providing the personality and individual contact with the writers, and defendant the business acumen.

Documents in the record confirm this dual effort. All loans of art to museums, and works of art put up for auction, initially bore the names of both parties. Even the subsequent auction of works solely in defendant's name required plaintiff's release. Defendant's explanation in support of his claim of sole ownership, that the adding of plaintiff's name was only to enhance her social status, is, under the circumstances, implausible. As proof of this, some of the works unsuccessfully put up by the parties for auction jointly in 1965 appeared in the 1973 auction catalog bearing only defendant's name.

Imposition of a constructive trust rests on a demonstration of the existence and extent of four critical elements: (1) a confidential or fiduciary relationship, (2) a promise or agreement, express or implied, (3) a transfer in reliance upon said agreement, and (4) unjust enrichment thereby (*Sharp v Kosmalski*, 40 NY2d 119, 121).

Unfortunately, the arguments presented to this court are filled with self-serving statements and bitter recriminations. Each party seems to dwell more on negative inferences sought to be drawn from deficiencies in the

other's case than on positive evidence in the party's own case. For example, defendant points to a 1974 letter from plaintiff, asserting her right to an interest in certain identified paintings, as unique evidence that she had no similar interest in any *other* properties. And plaintiff, in seeking to disprove defendant's assertion that he bought most of the Scull collection of art out of his own income and savings, rather than from assets of jointly held corporations, points to the absence in the record of any tax returns by defendant between 1958 and 1967 which would assertedly show his meager income at the time. Still, the record is adequate for a determination on the elements of a constructive trust.

That a confidential relationship existed cannot be disputed in light of a marriage that lasted for 30 years, and Trial Term so found. The record clearly reveals a relationship in which defendant handled all the financial matters related to the family business and the acquisition and disposition of works of art. As to the second element, an agreement for joint venture between spouses is rarely spelled out in writing. Such promises are usually implicit in the nature of the marital relationship (*Janke v Janke,* 47 AD2d 445, 448-449, affd 39 NY2d 786). Of course, a mere promise, made within the intimate confines of the marital association and standing alone, is not enough from which to infer a joint interest in property (*Saff v Saff,* 61 AD2d 452, app dsmd 46 NY2d 969). Nevertheless, there is independent evidence, from an objective standpoint, of a pattern or a life-style indicating that the parties were engaged in a joint venture as collectors of art.

Defendant points to his unaccompanied art-buying jaunts abroad, and documents confirming his sole interest in works to be purchased, loaned, stored or auctioned. Actually, most of the documents evincing sole ownership date from the period when the marriage was beginning to go sour, a time when motives for nominal designation may very well have been ulterior.

Plaintiff presented several witnesses from the world of art who testified that the parties were recognized and acknowledged as a "team", a "duo", a "dual activity" in their patronage of artistic endeavors. To this, defendant,

who presented no evidence to the contrary, could only respond that the only one of these witnesses who had any kind of business acquaintance with the parties had once written a letter (in 1964) addressed solely to defendant, thanking him for his contribution to the career of Jasper Johns. Defendant also points out that plaintiff, who portrays herself as the social magnet toward which up-and-coming artists were drawn, failed to call any artists as witnesses, implying that these artists would have testified that they really owed their success and public acclaim to defendant. That is an inference that cannot be drawn from this record. Defendant could also just as easily have called an artist-witness to refute plaintiff's witnesses as to her coequal participation in these endeavors. The 1964 letter does not satisfy that proposition.

There is little evidence to support defendant's contention that what the art world took to be a joint effort, by all outward appearances, was merely a facade created by defendant to enhance his wife's status in society. Plaintiff's contribution in the nature of hosting parties, making personal contacts, accompanying her husband to art society functions, etc., cannot be written off as merely the fulfillment of normal spousal duties, as suggested by Trial Term. The record clearly demonstrates a venture jointly and knowingly embarked upon by these parties.

Critical to the question of transfer of property in reliance on the agreement is defendant's failure to account for the source of funds for the purchase of the Scull collection. It is conceded that the parties were supported handsomely, in the early years of the marriage, by assistance from plaintiff's father, in the nature of both cash and gifts in kind in the form of taxicab corporations. All of these gifts, though jointly owned, were managed solely by defendant, by apparent mutual agreement. Trial Term had difficulty accepting the notion that plaintiff would leave management of everything to her husband if she indeed had an interest. Nevertheless, we find the evidence supportive of that contention. Indeed, it is incomprehensible that plaintiff would have deemed all these gifts to belong solely to her husband, simply because he managed the financial affairs. Nor is it conceivable that her father gave or intended to give the

cash and taxicab business to defendant to the exclusion of plaintiff, the donor's daughter.

Trial Term concluded that purchases made with loans defendant took from jointly held company assets should not have imposed any obligation on defendant to account to plaintiff. This ignores the realities of the relationship between the parties, and the testimony that Super Operating Company employed staff whose sole function was devoted to the business of art. Defendant's contention that purchases were made from his personally earned salary between 1958 and 1967 must be rejected, in the face of plaintiff's assertion that defendant's salary during this period was inadequate for such investment, and especially in light of defendant's surprising inability to produce income tax returns for those critical years. These gaps in defendant's case cannot be ignored. The inevitable conclusion is that defendant's art purchases were not made solely out of his own assets.

That defendant has been enriched by his investment in art cannot rationally be disputed. The 1973 auction brought $2,000,000, and the Scull collection is today valued in the millions of dollars. The record reveals the tremendous appreciation in value of additions to the Scull collection. To leave these works solely in defendant's hands would, under the circumstances, indeed be to enrich him unjustly.

The record reveals the jointly owned taxicab business as the source of the funds for the art collection. Although the works of art and their proceeds in many instances ended up in defendant's name, it is palpable that its derivation was the income from what was basically a family business. The bulk of the art was accumulated from these proceeds and the collection was plainly the product of the parties' virtually lifetime joint efforts in its creation and their reputation as joint patrons of the arts. On this basis a constructive trust is to be imposed.

As stated in *Sharp v Kosmalski* (40 NY2d, at p 121): "Generally, a constructive trust may be imposed '[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain

the beneficial interest' (*Beaty v Guggenheim Exploration Co.,* 225 NY 380, 386 * * *) ."

By this standard a constructive trust is to be imposed upon this defendant. Trial Term found lacking an express agreement or a transfer of funds or property from plaintiff to defendant. Under circumstances such as these, no such express agreement or transfer could be expected or found (*Sinclair v Purdy,* 235 NY 245, 254). The whole source of the property consisted in the joint funds and efforts of the parties. Defendant has received and taken benefits, the retention of which would be unjust. "Though a promise in words was lacking", the whole enterprise was " 'instinct with an obligation' * * * (*Wood v Duff-Gordon,* 222 N.Y. 88, 91)" (*Sinclair v Purdy,* 235 NY, at p 254).

Although the precise extent of each party's participation, contribution and interest remains to be determined, the facts of joint participation and ownership cannot be ignored.

This goes as well for the Connecticut realty. Testimony in the record supports plaintiff's contention that the property was inspected and purchased jointly as a prospective residence for the parties, and that defendant consistently referred to the property as belonging to both of them. The parties have lived in several homes since their marriage began in 1944. That the Connecticut property was to be jointly owned by the parties is more than just an "assumption" on plaintiff's part.

In light of this disposition in regard to tangible assets, we believe the alimony award was adequate.

The judgment of Supreme Court, New York County (PECORA, J.), entered October 19, 1981, dismissing after trial plaintiff's second, fourth, fifth and sixth causes of action, *inter alia,* is modified on the law and the facts to reverse as to the second, fourth and sixth causes of action, with judgment granted to plaintiff on those causes of action, and otherwise affirmed, without costs.

SILVERMAN, J. (dissenting in part). I would affirm the judgment appealed from.

The case involves pure questions of fact as to whether the parties made an agreement and as to what their

intentions were. I agree with the Trial Judge's analysis of the evidence on the basis of which he resolved these questions of fact in favor of defendant. But even if the case were closer, I would still affirm the Trial Judge's findings. The Trial Judge here sat through a month of trial involving about 3,000 pages of transcript and close to 500 exhibits. He thus had much more opportunity to consider the evidence than we had. And of course he had the opportunity to observe the witnesses, which we did not. As the Court of Appeals recently said, precisely in relation to determining whether to impose a constructive trust on property and what the agreement of the parties was the appellate court must take "into account in a close case 'the fact that the trial judge had the advantage of seeing the witnesses' (*York Mtge. Corp. v Clotar Constr. Corp.*, 254 NY 128, 134)." (*Miller v Merrell*, 53 NY2d 881, 883.) "In a case so close as this, let the court of first instance decide. Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth * * * To the sophistication and sagacity of the trial judge the law confides the duty of appraisal." (*Boyd v Boyd*, 252 NY 422, 429.)

SULLIVAN, J. P., BLOOM and ALEXANDER, JJ., concur with FEIN, J.; SILVERMAN, J., dissents in part in an opinion.

Judgment, Supreme Court, New York County, entered on October 19, 1981, modified, on the law and the facts, to reverse as to the second, fourth and sixth causes of action, with judgment granted to plaintiff on those causes of action, and otherwise affirmed, without costs and without disbursements.