Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/28/2022 09:05 AM CDT

Jonathan B. Simons, appellant, v.
Heather L. Simons, appellee.
___ N.W.2d ___

Filed August 5, 2022.    No. S-21-599.

1. **Pleadings: Appeal and Error.** Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion.

2. **Constitutional Law: Due Process.** The determination of whether the procedures afforded to an individual comport with constitutional requirements for procedural due process presents a question of law.

3. **Trusts: Equity: Appeal and Error.** An action to impose a constructive trust sounds in equity, which an appellate court reviews de novo on the record, giving consideration, where the evidence is in conflict, to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of facts rather than the opposite.

4. **Divorce: Child Custody: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.

5. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

6. **Appeal and Error.** Appellate courts do not generally consider arguments and theories raised for the first time on appeal.

7. **Antenuptial Agreements.** As a contract, an antenuptial agreement is governed by the same principles that are applicable to other contracts, but is subject to the particular statutory requirement that an antenuptial agreement must be based on fair disclosure.

8. **Contracts: Intent.** When the terms of a contract are clear, a court may not resort to rules of construction, and terms are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract.

9. **Due Process: Words and Phrases.** While the concept of due process defies precise definition, it embodies and requires fundamental fairness.

10. **Rules of the Supreme Court: Pleadings.** The key inquiry for "express or implied consent" under Neb. Ct. R. Pldg. § 6-1115(b) is whether the parties recognized that an issue not presented by the pleadings entered the case at trial.

11. **Divorce: Property Division.** In an equitable property division governed by Neb. Rev. Stat. § 42-365 (Reissue 2016), all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule.

12. **Antenuptial Agreements: Property Division.** Spouses are able to contract around the general rules of equitable division by using a premarital agreement.

13. **Trusts: Property: Title: Equity.** Under a constructive trust, equity vests title to the subject property in the wronged party and the court may issue a decree that the title be so conveyed.

14. **Trusts: Property: Title.** A constructive trust is imposed when one has acquired legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property.

15. **Trusts: Property: Title: Equity.** A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the grounds that his or her acquisition or retention of the property would constitute unjust enrichment.

16. **Trusts: Equity.** In determining whether to impose a constructive trust, the court will consider not only the original situation but also all events which have occurred since the defendant began to hold inequitably.

17. **Trusts: Proof.** A party seeking the remedy of a constructive trust has the burden to establish the factual foundation, by evidence which is clear and convincing, required for a constructive trust.

18. **Trusts: Equity.** The constructive trust doctrine is equitable in nature and should not be rigidly limited, and the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity.

19. **Equity.** Where a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation.

20. ____. Equity is not a rigid concept, and its principles are not applied in a vacuum.

21. ____. Equity is determined on a case-by-case basis when justice and fairness so require.

22. **Trusts: Property: Title: Equity: Proof.** Generally, a court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee of the legal title for property unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that, under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.

23. **Trusts: Equity: Unjust Enrichment.** A constructive trust is imposed to do equity and to prevent unjust enrichment.

24. **Unjust Enrichment.** Unjust enrichment is a flexible concept, occurring when a claim is based on the failure of consideration, fraud, or mistake and in other situations where it would be morally wrong for one party to enrich himself or herself at the expense of another.

25. **Fraud.** Fraud comprises all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.

26. **Appeal and Error.** An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court.

27. ____. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

28. **Limitations of Actions: Waiver.** A statute of limitations is nonjurisdictional and waivable.

29. **Expert Witnessess.** The determination of the weight that should be given expert testimony is uniquely the province of the fact finder.

30. **Valuation.** A trial court is not required to accept any one method of valuation as more accurate than another accounting procedure.

31. **Trusts: Property: Title: Declaratory Judgments.** The ownership rights of a constructive trust beneficiary, once recognized, are protected from the moment the trustee acquired legal title, the constructive trust decree being in the nature of a declaratory judgment about the state of title to the property.

32. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.

33. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result.

Appeal from the District Court for Douglas County: Gregory M. Schatz, Judge. Affirmed in part, and in part vacated.

John A. Kinney, Jill M. Mason, and Samantha M. Robb, of Kinney Mason, P.C., L.L.O., for appellant.

Benjamin M. Belmont and Wm. Oliver Jenkins, of Brodkey, Cuddigan, Peebles, Belmont & Line, L.L.P., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

# I. INTRODUCTION

In a dissolution action governed by a premarital agreement, the court imposed a constructive trust over certain limited liability companies titled solely in the respondent's name, such that they were considered additions to the marital estate under the agreement. The petitioner appeals the court's judgment, arguing that the court abused its discretion in allowing the respondent to amend her pleadings to conform to the evidence at trial to include the issue of the constructive trust, that the trust was in conflict with the premarital agreement, that the evidence did not support a constructive trust, and that the amount of the trust was in error. The petitioner also challenges the court's award of a $150,000 lump-sum payment under the terms of the premarital agreement, an order to maintain life insurance to fund a support order, the inclusion of a truck in the marital estate, and the amount of the alimony award.

# II. BACKGROUND

Jonathan B. Simons brought a complaint for dissolution of his marriage to Heather L. Simons. Jonathan and Heather were

married in 2005. Two children, still minors at the time of filing, were born to the marriage. The complaint alleged that a premarital agreement controlled the division of their assets and debts. In her operative answer, Heather asked, among other things, for an equitable division of the marital estate and for alimony. She denied the validity of the premarital agreement. However, the court ultimately found the agreement was valid, and that finding is not challenged on appeal.

## 1. Issues in Controversy

The court issued a pretrial order directing the parties to submit a letter stating the issues in controversy, the issues not in controversy, and a concrete statement of the relief sought. As relevant to this appeal, the letter submitted by Heather's counsel set forth as issues in controversy the following:

4. Whether Jonathan holds one half of the membership interest in JBS Kids Play & Fitness, LLC; JBS Properties, LLC and Dogwatch, LLC in a constructive trust for the benefit of Heather.

5. Does Jonathan have an equitable duty to convey one half of the membership interest in JBS Kids Play & Fitness, LLC; JBS Properties, LLC and Dogwatch, LLC to Heather on the ground that his acquisition or retention of the membership interests would constitute unjust enrichment.

6. If the Premarital Agreement is valid and enforceable, whether three limited liability companies [Jonathan] organized to operate the parties' businesses which were started during the marriage and in which Heather was an owner and held out to the public as being an owner are part of the marital estate;

7. Whether the provision of the Premarital Agreement stating, "Anything in this section 3.2 to the contrary notwithstanding, in no event shall [Jonathan's] Property or Heather's Property be made a part of or be considered in determining any alimony award as herein contemplated"

is valid, or contrary to law and if contrary to law, is it able to be severed from the Premarital Agreement.

8. Whether Jonathan has comingled any purported separate funds with marital funds to subject those funds to an equitable division;

9. The determination of what assets are part of the marital estate and the equitable division of the marital estate[.]

A copy of the letter was sent to opposing counsel, who raised no objections.

Before trial commenced, Jonathan's counsel argued to the court that the premarital agreement was enforceable and that, under the agreement, title controls—assets jointly titled are marital while assets not jointly titled are not marital.

Heather's counsel responded that even with the premarital agreement, the court had equitable powers, there were issues as to what exactly the agreement means, and "[i]t's not just a matter of title." Heather's counsel elaborated that at issue in the case was a business Heather and Jonathan started together, which they both worked for and which Jonathan represented to Heather and to others that he and Heather jointly owned. Heather's counsel argued that the fact the business was titled solely in Jonathan's name should not be controlling of the distribution even under the premarital agreement.

At the conclusion of the evidence presented at trial, Heather moved to amend her pleadings to conform to the evidence so as to allege constructive trust and unjust enrichment. A discussion ensued with Jonathan's counsel arguing that Heather's position relating to a constructive trust was simply a type of equitable distribution that would not be applicable if the premarital agreement, which distributed assets by title, was valid. Heather's counsel responded that the claimed constructive trust was not mooted by a possible finding that the premarital agreement is enforceable; rather, a constructive trust created under equitable principles would simply make that asset marital under the terms of the premarital agreement. The record

does not reflect that Jonathan's counsel raised the waiver provision of the agreement found in section 6.

The court granted the motion to amend the pleadings over Jonathan's objection, stating from the bench, "I don't see how the amendment to the pleadings would change the evidence, nor would the Court's equitable resolution of the issues presented." The court reasoned further in its written order that the issues were set forth in the pretrial letter and that Jonathan raised no objection to the litigation of those issues either before or during the trial in which those issues were actually litigated. The court noted that a constructive trust and unjust enrichment are equitable concepts and that Heather raised in her pleadings the issue of the equitable division of the marital estate and the court's equitable jurisdiction. Finally, the court found that Jonathan was not prejudiced by the amendment.

## 2. Premarital Agreement

The premarital agreement was entered into evidence at trial. Section 1.5 of the agreement describes the "Marital Estate":

> Anything in this Agreement to the contrary notwithstanding, to the extent that [Jonathan] or Heather have acquired or in the future acquire and affirmatively transfer or convey any assets the title to which, as evidenced by some written instrument, is held by them after such acquisition, transfer or conveyance in any form of co-ownership, including but not limited to tenancy in common, joint tenancy, tenancy by the entirety or community property, such property shall be deemed to constitute and be part of the "Marital Estate." The Marital Estate shall include any appreciation or depreciation on the assets forming a part of the Marital Estate but shall not include any earnings thereon, proceeds therefrom or replacements thereof unless such earnings, proceeds or replacements, as the case may be, are also titled in some form of co-ownership. . . . The Marital Estate shall be subject to division, distribution and disposition as hereinafter provided in this Agreement.

Section 3.4, in turn, addresses division of the marital estate, providing that "[i]n the event of a future legal separation, divorce, annulment or other dissolution of this proposed marriage, [Jonathan] and Heather agree that the Marital Estate shall be divided equally between them."

Section 3.3 sets forth the division of separate property in the event of divorce, providing:

As further provided in Section 6 hereinafter, or in any other part of this Agreement:

. . . .

(b) Heather hereby waives any and all claims for division of property or property settlement from [Jonathan] with respect to [his] Property in the event of a future legal separation, divorce, annulment or other dissolution of this proposed marriage. Anything in this Agreement to the contrary notwithstanding including the foregoing sentence, in the event of a future legal separation, which ultimately results in a divorce or dissolution; divorce, annulment, or other dissolution of this proposed marriage (for purposes of this Section, an "Action") and at the time of initiation of such Action, Heather and [Jonathan] have children born to them or legally adopted by them during the marriage or Heather is pregnant with a child of [Jonathan] and Heather, [Jonathan] shall be required to pay to Heather a lump sum of money based on the number of Full Year(s) of Marriage subsequent to the marriage date . . . .

Under the schedule, if the marriage ends after between 10 and 15 years of marriage, then Jonathan would have to give Heather a lump sum of $150,000.

Jonathan's property is defined in section 1.1 of the agreement:

[Jonathan's] Property. A listing of the assets and liabilities of [Jonathan] has been prepared and a copy thereof has been given to Heather and is also attached to this Agreement as Exhibit "A," and is, by this reference,

made a part of this Agreement. Such assets and liabilities of [Jonathan] as set forth on Exhibit "A," together with proceeds and income therefrom, replacement(s) thereof and appreciation or depreciation in value thereon as more specifically described in Sections 1.4, 2.1, 2.2, 4.1, 4.2, and 4.3, shall hereinafter be referred to as "[Jonathan's] Property."

Section 4 of the agreement governs the treatment of assets, liabilities, earnings, and expenses during the marriage. Section 4.1, "Assets as Separate Property," states:

Each of the parties agrees that, unless and until transferred and conveyed to the Marital Estate as contemplated by Sections 1.5 and 4.6, the following described property shall remain the separate and solely owned property of its owner (i.e., Heather's Property or [Jonathan's] Property as the case may be):

(a) All property, whether real or personal, owned by either party as of the effective date of this Agreement;

(b) All property and property rights acquired by a party out of the proceeds or income from property at the effective date of this Agreement, or attributable to appreciation in value of such property, whether the enhancement is due to market conditions or to the services, skills, or efforts of its owner or anyone else; and

(c) All property acquired by either party by gift, devise, bequest or inheritance.

Section 4.3 sets forth "Earnings as Separate Property" and states that earnings from the work of one of them is the separate property of the person to whom they are attributable.

Section 4.6 describes "Additions to the Marital Estate":

Nothing in Section 4 shall prohibit the parties from making additions to the Marital Estate from [Jonathan's] Property or from Heather's Property or from their individual earnings but any such addition must be evidenced by some written agreement or acknowledgment of the same or some affirmative act resulting in the titling

of additional property as part of the Marital Estate as described in Section 1.5 above.

Section 1.6 sets forth Jonathan's obligation to carry life insurance during the marriage, stating in relevant part:

[Jonathan] agrees to acquire, own and maintain, at his sole cost and expense, a policy of life insurance insuring his life, with a face amount of not less than $1,000,000.00. . . . In the event of the parties' legal separation or dissolution of the proposed marriage while said life insurance policy is in effect, the parties agree any cash value attributable thereto shall be equally divided between them, and Heather at her election, shall be entitled to retain such policy at her sole cost and expense.

Section 6 sets forth a waiver as follows:

Except as otherwise specifically provided in this Agreement, each party waives all rights he or she may have in all or any part of the property of the other under any law now or hereinafter in effect in any jurisdiction, whether by way of dissolution of marriage, separation, descent, courtesy, dower, distributive share, exempt property, homestead property, right to elect against a will, augmented estate, or any other right or interest, and each agrees he or she will not make any claim of any kind to the property of the other in the event of death, dissolution of marriage, or separation except as specifically contemplated by the provisions of this Agreement, if at all. Without limitation, this Agreement shall be construed to be a waiver similar to and with the same force and effect as provided by Neb. Rev. Stat. § 30-2316 and § 42-1001, *et seq*. Stated otherwise, except as otherwise provided therein, this Agreement is intended as a waiver of all rights to alimony, support, property division, elective share, homestead allowance, exempt property, and family allowance by each party in the property of the other and a renunciation by each of all benefits which would otherwise pass to him or her from the other by

intestate succession, or by virtue of the provisions of any will executed before this waiver or by virtue of any other law.

Section 8.3 further specifies that to the extent necessary to implement its terms, the agreement shall be interpreted as a "renunciation pursuant to Neb. Rev. Stat. § 30-2352," a "waiver pursuant to Neb. Rev. Stat. § 30-2316," a "waiver as to the augmented estate pursuant to Neb. Rev. Stat. § 30-2314(c)," a "waiver as to homestead rights pursuant to Neb. Rev. Stat. § 40-104," and a "waiver of spousal rights to qualified retirement plan benefits."

## 3. Trial

At trial it was undisputed that Backyard Adventures was purchased in the summer of 2009. Heather had quit working in 2008 after the birth of her and Jonathan's first child. Jonathan was unhappy at his place of employment, and Jonathan and Heather looked for a business that could be a good fit for their family. Heather described that they were looking for "something we could do together that I would still be able to raise our kids but that I would be able to be an active part in and do something." They found Backyard Adventures.

Jonathan worked with an attorney to form a limited liability company, JBS Kids Play & Fitness, LLC (JBS Kids Play), to purchase Backyard Adventures at a purchase price of $444,391.04. The name "Backyard Adventures" was retained by the seller, so Jonathan changed it to Backyard Adventures Playworld and, eventually, around 2011, to Backyard Playworld.

Jonathan's parents gifted $375,000 toward the purchase price, transferring the gift directly into a checking account of JBS Kids Play. Jonathan testified that the remaining $65,000 of the purchase price came from the marital joint account.

At the time of the purchase, the marital joint account had a balance of approximately $188,000. Jonathan denied that he and Heather had been saving up to purchase a business, stating that "[i]t takes more than $188,000 to buy a business and

operate a business." Heather, in contrast, understood that they had been living frugally and saving the substantial income they both made before Heather had their first child in order to purchase a business. She testified she did not know that a gift from Jonathan's parents was made and used toward the purchase price. Rather, she was led to believe the purchase money came from the joint account.

The evidence was disputed concerning what representations were made by Jonathan with respect to the ownership of the business. This line of questioning was not objected to by Jonathan's counsel.

Heather testified that she believed they were purchasing Backyard Adventures together and that she had no idea that Jonathan was going to be the sole owner under a limited liability company (LLC) established for that purpose. She did not learn of the LLC until after the divorce proceedings were commenced. Heather testified that Jonathan indicated to her they were co-owners of Backyard Playworld. Heather testified that Jonathan introduced her to people as a co-owner.

Jonathan testified that at some point before closing, he told Heather the business would be titled solely in his name. In his prior deposition testimony that was adduced at trial, however, Jonathan had stated that he did not recall ever discussing the ownership interest of the business. Later in his testimony at trial, Jonathan stated with respect to whether he told Heather "she was not a co-owner of the business," that "I don't have any recollection of saying one or the other."

Heather was present at closing but did not sign any of the paperwork. She described that she did not think this unusual given her prior work experience at a car dealership and her understanding that with cash transactions there can be two names on the title but only one person needs to sign it.

The closing statement for the purchase described Jonathan as "Managing Partner, Buyer." Heather was not present when Jonathan went to his attorney to establish JBS Kids Play. Jonathan admitted that he never had a conversation with

Heather explaining that he was forming an LLC in his own name for the purpose of being the sole owner of Backyard Playworld.

In his deposition testimony adduced at trial, Jonathan had stated he did not know why Heather's name was not on any of the paperwork for the purchase of the business. Jonathan testified at trial he did not know if there was any reason Heather would have believed for the previous 14 years that she was not the co-owner of Backyard Playworld. Jonathan testified that when the purchase was made, he and Heather trusted each other.

Heather was the only authorized signatory other than Jonathan for the bank account associated with JBS Kids Play. Without objection, the court accepted into evidence the picture of a sign displayed for the public at the entrance of Backyard Playworld with a message welcoming customers. It was signed by "Heather and Jon Simons - Owners." Also entered into evidence without objection was a copy of the business cards provided by Jonathan to Heather, which described a "family company" and Heather as "[o]wner."

A former employee of Backyard Playworld, who had worked for Backyard Adventures before the purchase, testified he was introduced to Jonathan and Heather as co-owners of the business. He testified that Jonathan specifically introduced Heather to him as an owner and that he had witnessed Jonathan introduce Heather to other people as an owner of the business.

Heather described that after they purchased Backyard Adventures, she worked on site, bringing their 11-month-old child to work with her. She generally worked 7 days a week from opening at 10 a.m. until 3 p.m. when their child took a nap. She worked in the "front of the store" in sales while Jonathan worked in the "back." She continued to work in that manner, later bringing their second child to work as well or asking the children's grandparents to babysit, until the children's activities required Heather to be away from work

more often, approximately 3 or 4 years before Jonathan filed for divorce. Heather continued to work on an "as-needed" basis.

Heather also described contributing and implementing successful new ideas for the business, such as hosting birthday parties on a larger scale than the prior owner had and having "pay to play" hours. It was also Heather's idea to host end-of-the-year school parties, to rent the facilities to organizations, to host parties for a charitable foundation, and to set up sponsorship tents at various events.

Jonathan testified that before purchasing Backyard Adventures, he and Heather had discussed that she was going to work in the business. Jonathan testified that Heather worked at Backyard Playworld on the sales floor and answered phone calls, explaining "there wasn't a lot of money to go around as far as starting a new business, and . . . my spouse, was, you know, not only a reliable employee but obviously a way to have a staff without having an expense."

Jonathan testified that he paid Heather a yearly salary of around $10,000 to be able to fund her individual retirement account to the maximum allowable each year. Heather was paid at the end of the year, and Jonathan would sign the checks and deposit them into the marital joint account. The record contains copies of yearly checks made out to Heather from JBS Kids Play for approximately $7,000 each and signed by Jonathan.

Heather described a division of marital responsibilities under which she was not privy to their finances. During the marriage, Heather did not maintain a separate bank account. Jonathan maintained a separate, personal checking account, which Heather testified at trial she was not aware of. Heather stated she believed all income and gifts were going into the joint marital account. However, Jonathan described that each year his parents gifted the maximum allowable tax-free amount to both him and to Heather and that he deposited the check made out to him into his personal account and

deposited the check made out to Heather into their marital joint account. Jonathan testified that he took care of all the "financials" in their relationship.

The parties' second child was born in 2010. According to Jonathan, he and Heather began experiencing marital difficulties in 2013 and sought legal advice concerning a possible divorce in 2017. But they continued to work on their marriage, and Jonathan did not move out until the spring of 2020. Heather confirmed the dates of these marital difficulties and testified that Jonathan asked her not to leave because he could not run Backyard Playworld without her.

In 2017, Jonathan formed DogWatch, LLC, to separate a hidden fencing business from Backyard Playworld for purposes of selling it. The proceeds of the sale of DogWatch was held in an account under DogWatch's name, which has a balance of $333,497.24. Heather testified she worked in sales for the hidden fencing aspect of the business and handled those customers' needs. According to Heather, it was a joint decision to sell that aspect of the business. She knew a separate checking account had been established for DogWatch but did not know it had been separated into an LLC under Jonathan's sole ownership.

While Backyard Playworld originally operated out of a leased space, Jonathan and Heather decided to purchase a building in 2019 from which to operate. Jonathan formed JBS Properties, LLC, to make the purchase.

Jonathan testified that Heather was not involved in the decision as to which building was ultimately purchased for Backyard Playworld in 2019—at least he did not recall that she was. Jonathan described that he took Heather to see the building, but he testified she did not help him find it. Jonathan did not recall that Heather was involved in planning the layout of the new building.

Jonathan testified that Heather had no involvement in the formation of JBS Properties. The money to purchase the new building came from cash out of JBS Kids Play with the

remainder from financing. Heather's name is not on any of the documents associated with the purchase of the building.

Heather testified it was always their long-term goal to purchase a different location for the business rather than lease space. She testified she was involved in discussions regarding the move and accompanied Jonathan in looking for possible buildings. Once the new building was purchased, according to Heather, she helped plan the layout for the new space. Heather had no knowledge of the existence of JBS Properties.

At the time of trial, Jonathan's personal net worth, not including the businesses, was approximately $5.3 million. Jonathan's net worth had increased by approximately $4 million during the course of the marriage.

Jonathan testified that the only asset jointly titled to both himself and Heather was their house. Their jointly held checking account had been dissolved. Jonathan denied making any representations to Heather that she jointly owned JBS Kids Play.

Gregory Harr, an accredited business valuator, testified as an expert for Heather concerning the value of Backyard Playworld. Harr testified that there are three approaches in assigning a value to a business: the asset approach, the income approach, and the market approach. Harr explained that the asset approach is typically used for companies that are going to be liquidated or that are heavy in real estate or securities. Harr explained that the market approach uses several different factors to determine a probable sale price. The income approach attempts to value a future economic benefit.

Harr valued JBS Kids Play as of 2019 using the "fair value" approach, valuing it as a "going concern" utilizing both the market approach and the income approach versus the asset approach.

Harr testified, without objection, that it was his professional opinion that the "fair value" approach was the more accurate valuation approach for divorces. Harr explained there is a difference between "fair value" and "fair market value":

> Fair market value is going to be the value that is deter-
> mined by a hypothetical buyer and a hypothetical seller,
> neither one of which is being forced to make a decision as
> to what the — what it's going to be selling for. The value
> of fair market value, depending upon what you're going
> to have is if it's a controlling interest or a noncontrolling
> interest. Discounts come into play for that situation, and
> the size of the discount will depend upon whether it's
> controlling or non-controlling. But then you also in all
> cases with fair market value you're going to have a lack
> of marketability that comes into play. And the difference
> between fair market value and fair value is that there
> [are] no discounts in fair value versus fair market value
> because of the situation.

In sum, Harr affirmed he was "just not including in some cases
the discount for lack of control," which he would not apply
anyway in this case.

Daniel Morris, who was accredited in business valuations,
was the expert retained by Jonathan to assess the value of JBS
Kids Play, doing business as Backyard Playworld. He testified
that he chose fair market value as opposed to fair value as the
standard to determine the valuation of Backyard Playworld
because

> there's a reasonable expectation that if this business were
> to be sold — not to a specific buyer but to a buyer, which
> is supposed to represent any potential buyer — that the
> price would need to be fair market value in order for that
> transaction to occur.

Morris opined that fair value was not an appropriate method-
ology in a divorce in Nebraska, explaining that while "both
methods are used because they are commonly both accepted
practices," he did not believe Jonathan would be able to get
a fair value in the real world if he were to actually sell the
business. He explained that "therefore, a discount for lack of
marketability must be applied."

Morris elaborated that one of the big differences between fair value and fair market value is fair value does not allow discounting. In his valuation, Morris discounted 28 percent from the net book value of the going concern, for what Morris perceived to be its lack of marketability.

Morris conceded in cross-examination that his valuation utilizing fair market value for JBS Kids Play as a going concern was significantly lower than its net book value that could be received if liquidated. Morris explained the discrepancy by stating that he did not use the asset approach.

Morris conceded that "[p]otentially," fair value, as opposed to fair market value, of a business in a divorce case means "we're not going to use discount because a property isn't up for sale, it isn't going to be sold." Morris testified that in his experience, he has seen both fair value and fair market value approaches utilized in divorce cases. Morris conceded that in his interviews with Jonathan there was no indication of an intention to sell Backyard Playworld, but he thought that the use of fair value favors one spouse by "using a specific buyer."

Both experts testified as to the unusual amount of cash equity being held by JBS Kids Play in comparison to its operating expenses. Its bank account held over $700,000 in cash.

Heather testified that she graduated from high school and does not have a college degree. When she and Jonathan were married, Heather was working in aftermarket sales in the parts department at a car dealership. It required her to work approximately 50 hours a week and included working well into the evening and on weekends. She earned approximately $95,000 per year her final 2 years at that job. Prior years averaged around $70,000 annually. She had not worked outside the home anywhere other than at Backyard Playworld since the birth of the oldest child of the marriage approximately 12 years prior to the hearing. Heather did not think she could go back to sales work at a car dealership due to her obligations caring for the children and because of the use of newer technology that she has no experience with.

Heather submitted a list of monthly living expenses in the amount of $13,630. There was evidence that Jonathan's monthly net income was $31,154 and that Heather's monthly net income was $1,098. Other evidence showed Jonathan had a net cashflow of $590,990.37, derived from Backyard Playworld and various personally owned investment accounts.

## 4. Decree

### (a) Constructive Trust

The court found the premarital agreement to be valid and enforceable. However, the court concluded that Heather had proved by clear and convincing evidence the existence of a constructive trust in Backyard Playworld such that Jonathan had an equitable duty to hold half of those businesses in trust for Heather; otherwise, Jonathan would be unjustly enriched. The court found that the entity the parties originally purchased, Backyard Adventures, was ultimately composed of JBS Kids Play, JBS Properties, and DogWatch.

The court found that Jonathan and Heather jointly looked into business opportunities and decided on purchasing Backyard Adventures. Heather believed, based on the discussions with Jonathan, that they were purchasing the business together. Jonathan told Heather it was not necessary for her to sign any documents at closing because it would be a cash transaction. Of the $445,000 purchase price for the business, $375,000 came from a gift from Jonathan's father.

The court found that when Jonathan and Heather decided in 2019 to purchase a separate building for Backyard Playworld, Heather accompanied Jonathan to see the real estate agent, after which Jonathan and Heather jointly decided upon a building to purchase, and Heather assisted in planning the layout. Heather was led to believe from Jonathan that the building was an asset they owned together and was part of the business. The money to purchase the building came from Backyard Playworld. Heather was unaware until the commencement of the divorce proceedings that Jonathan had

placed the new building in a separate LLC controlled solely by Jonathan.

The court found that Jonathan led Heather to believe they owned Backyard Playworld together and that Heather was unaware Jonathan had formed JBS Kids Play to hold their company. The court noted statements by Jonathan to Heather and employees working at Backyard Playworld that Heather was an owner. The sign at the entry of the building, as well as business cards, referred to Heather as an "[o]wner" of Backyard Playworld. The court found that Heather worked significant hours at the business up to approximately 3 to 4 years before Jonathan filed for divorce, when she reduced her hours in order to take their children to and from activities. The court found that Heather worked without getting a paycheck and was unaware that Jonathan was issuing paychecks in her name, which he would deposit into their joint account that held the earnings from the business. The court found that Heather contributed toward the growth of the business not only by working on the sales floor but also through marketing, the creation of paid playtime as a new vehicle for revenue, the expansion of the party room rental, and the use of the play areas for events. She was also actively involved in the most recent acquisition of the new location and its interior layout.

The court observed that under section 4.6 of the premarital agreement, neither party was prevented from adding to the marital estate from their separate property and that, under section 3.4, the marital estate is to be divided equally. The court found that Jonathan contributed Backyard Playworld (which included JBS Kids Play, JBS Properties, and DogWatch) to the marital estate and that it should be divided equally between Jonathan and Heather.

The court found that the value of JBS Kids Play was $1,444,722. It found the value of DogWatch to be $333,497.24, which reflected the cash balance of the DogWatch account that held the proceeds from its sale. The court found that JBS Properties had an "equity value" of $500,000. Thus, the court

found that the total value of Backyard Playworld and its associated entities—to be divided equally between the parties—was $2,278,219.24.

## (b) Gift of $375,000

The court specifically found that the $375,000 gifted to Jonathan by his father and utilized in the purchase of Backyard Adventures was added to the marital estate pursuant to section 4.6 of the premarital agreement. Thus, it became a marital asset subject to division.

## (c) Truck

The court found that Jonathan's 2019 Ram pickup truck with a value of $57,141 should be made part of the marital estate.

## (d) $150,000

Pursuant to section 3.3(b) of the agreement, the court found that Jonathan was obligated to pay Heather $150,000 from Jonathan's separate estate. This was above and beyond the division of the marital estate.

## (e) Alimony and Life Insurance

The court awarded Heather monthly alimony of $5,500 for 72 months. The court also ordered child support, which is not at issue in this appeal.

The court ordered Jonathan to maintain life insurance coverage in an amount sufficient to fund his child support and spousal support obligations in the event of his death.

## III. ASSIGNMENTS OF ERROR

Jonathan assigns that the trial court erred (1) by allowing Heather to amend her pleadings to include claims of fraud, unjust enrichment, and constructive trust after the trial, unfairly surprising him with new claims and denying him due process; (2) in its finding that Heather proved by clear and convincing evidence that Jonathan engaged in fraud and would be unjustly enriched unless Backyard Playworld were added to the marital estate via constructive trust; (3) in dividing the

marital estate and ordering life insurance to fund support; (4) in using the opinion of Heather's expert in valuing Backyard Playworld; (5) in its award of alimony; (6) in the specific findings related to documents signed at closing and the purchase of Backyard Adventures; and (7) in failing to impose the waiver in the Premarital Agreement.

## IV. STANDARD OF REVIEW

[1] Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion.[1]

[2] The determination of whether the procedures afforded to an individual comport with constitutional requirements for procedural due process presents a question of law.[2]

[3] An action to impose a constructive trust sounds in equity, which we review de novo on the record, giving consideration, where the evidence is in conflict, to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of facts rather than the opposite.[3]

[4] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.[4]

[5] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[5]

---

[1] *United Gen. Title Ins. Co. v. Malone*, 289 Neb. 1006, 858 N.W.2d 196 (2015).

[2] *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020).

[3] See, *ProData Computer Servs. v. Ponec*, 256 Neb. 228, 590 N.W.2d 176 (1999); *Ford v. Jordan*, 220 Neb. 492, 370 N.W.2d 714 (1985).

[4] See *Vanderveer v. Vanderveer*, 310 Neb. 196, 964 N.W.2d 694 (2021).

[5] *Devney v. Devney*, 295 Neb. 15, 886 N.W.2d 61 (2016).

[6] Appellate courts do not generally consider arguments and theories raised for the first time on appeal.[6]

[7] As a contract, an antenuptial agreement is governed by the same principles that are applicable to other contracts, but is subject to the particular statutory requirement that an antenuptial agreement must be based on fair disclosure.[7]

[8] When the terms of a contract are clear, a court may not resort to rules of construction, and terms are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract.[8]

## V. ANALYSIS

Several issues are presented in this appeal pertaining to the constructive trust, the first of which is whether the court erred in considering the question of a constructive trust at all, given that it was not specifically mentioned in Heather's responsive pleading. Beyond that, Jonathan argues that the constructive trust was inconsistent with the premarital agreement and that the evidence was generally insufficient to establish a constructive trust. Lastly, Jonathan argues that the valuation of the trust, based on fair value, was an abuse of discretion.

The remaining issues presented in this appeal concern (1) a $150,000 lump-sum payment under the terms of the premarital agreement, which Jonathan claims to be inconsistent with the constructive trust; (2) an order to maintain life insurance to fund the support order, which he argues is inconsistent with the premarital agreement; (3) the inclusion of a truck in the marital estate, which Jonathan argues was already part of the business valuation informing the constructive trust; and (4) the alimony award, which Jonathan argues was excessive.

---

[6] *Maria T. v. Jeremy S.*, 300 Neb. 563, 915 N.W.2d 441 (2018).

[7] *In re Estate of Jakopovic*, 261 Neb. 248, 622 N.W.2d 651 (2001).

[8] *Id*.

### 1. Amendment of Pleadings

Before addressing the merits of the constructive trust, we first consider Jonathan's argument that the court erred in allowing amendment of the pleadings to include the issue of a constructive trust, as well as his related argument that his procedural due process rights were violated by a lack of timely notice to defend against the alleged constructive trust. Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion.[9] The determination of whether the procedures afforded to an individual comport with constitutional requirements for procedural due process presents a question of law.[10]

[9] While the concept of due process defies precise definition, it embodies and requires fundamental fairness.[11] Generally, procedural due process requires parties whose rights are to be affected by a proceeding to be given timely notice, which is reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by constitution or statute; and a hearing before an impartial decisionmaker.[12]

Nebraska's pleading rules provide for amendments to conform to the evidence, stating:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may

---

[9] *United Gen. Title Ins. Co. v. Malone, supra* note 1.

[10] *Dycus v. Dycus, supra* note 2.

[11] *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019).

[12] *Id.*

be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.[13]

Even when a party does not move to amend pleadings, a court may constructively amend pleadings on unpleaded issues in order to render a decision consistent with the trial.[14]

[10] A court's determination of questions raised by the facts, but not presented in the pleadings, should not come at the expense of due process,[15] and thus, our standards governing whether a court has abused its discretion in ordering constructive amendment of the pleadings are generally consistent with the fundamental fairness standards of procedural due process. We have said that the key inquiry for "express or implied consent" under § 6-1115(b) is whether the parties recognized that an issue not presented by the pleadings entered the case at trial.[16]

We have held that express consent may thus be found when a party has stipulated to an issue or the issue is set forth in

---

[13] Neb. Ct. R. Pldg. § 6-1115(b).

[14] *Denali Real Estate v. Denali Custom Builders*, 302 Neb. 984, 926 N.W.2d 610 (2019).

[15] *Eric H. v. Ashley H., supra* note 11.

[16] *R & B Farms v. Cedar Valley Acres*, 281 Neb. 706, 798 N.W.2d 121 (2011).

a pretrial order.[17] As the court below rightly emphasized, Jonathan had actual notice before trial that the issue of a constructive trust was to be tried, and he did not object or move for a continuance. The letter by Heather's counsel, which was ordered by the court to set forth the issues in controversy, explicitly set forth the question of a constructive trust, unjust enrichment, and whether, even if the premarital agreement were valid, Heather was entitled to an ownership interest due to Jonathan's representations. Jonathan's counsel was given a copy of this letter and did not raise any objections to the issues in controversy stated therein.

Jonathan's arguments that the letter was not a "pleading" and that it did not explicitly use the words "fraud" or "misrepresentation" miss the point. Fraud and misrepresentation are concepts inherent to any constructive trust claim, and a filing need not be a pleading in order to give the other party a timely and clear indication of the issues to be tried. Under the facts presented, we hold that the court did not abuse its discretion in ordering amendment of the pleadings pursuant to § 6-1115(b). We relatedly hold that because Jonathan had timely notice of the issues to be tried, the litigation of the constructive trust claim did not violate Jonathan's constitutional right to procedural due process. We turn to the merits of the constructive trust.

## 2. IMPOSING CONSTRUCTIVE TRUST

[11] In an equitable property division governed by Neb. Rev. Stat. § 42-365 (Reissue 2016), all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule.[18] Under equitable property division, even if an asset was acquired before the marriage, accrued investment earnings or appreciation of nonmarital assets during

---

[17] *Blinn v. Beatrice Community Hosp. & Health Ctr.*, 270 Neb. 809, 708 N.W.2d 235 (2006).

[18] See *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017).

the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse.[19]

[12] Spouses are able to contract around the general rules of equitable division by using a premarital agreement.[20] Neb. Rev. Stat. § 42-1004 (Reissue 2016) permits parties to a premarital agreement to contract with respect to, among other things, "The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located" and "[t]he disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event." In this appeal, there is no dispute that the premarital agreement between Heather and Jonathan was valid and enforceable.

(a) Coexistence With Premarital Agreements

The district court implemented the terms of the premarital agreement after imposing upon Jonathan a constructive trust with respect to one-half of the interest in the limited liability companies (LLCs) of Backyard Playworld, deeming them part of the marital estate under the agreement. It is true that this result happens to be similar to what would have occurred under equitable division under § 42-365, unless Jonathan had sustained his burden to prove the assets to be nonmarital. It is also true that "[t]he remedy of constructive trust may not be applied randomly to adjust general equities between spouses or as a punitive measure . . . ."[21] It does not follow, however, that the court conflated the remedy of constructive trust with simple equitable division.

---

[19] See *id.*

[20] See *Cook v. Cook*, 26 Neb. App. 137, 918 N.W.2d 1 (2018).

[21] *Saff v. Saff*, 61 A.D.2d 452, 456, 402 N.Y.S.2d 690, 693 (1978). See, also, 9 Alan D. Scheinkman, West's McKinney's Forms Matrimonial and Family Law § 3:11 (Feb. 2022).

[13-15] A constructive trust can coexist with valid premarital agreements setting forth separate and marital property similarly to the one here presented,[22] and the principles governing a constructive trust are meaningfully different from those governing the general equitable division of marital property. Under a constructive trust, equity vests title to the subject property in the wronged party and the court may issue a decree that the title be so conveyed.[23] A constructive trust is imposed when one has acquired legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property.[24] In such a situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof.[25] A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the grounds that his or her acquisition or retention of the property would constitute unjust enrichment.[26]

We disagree with Jonathan's general assertion that a constructive trust cannot be utilized to establish ownership for purposes of implementing a valid premarital agreement. And we find nothing in the ownership provisions of the premarital agreement set forth above that precludes the remedy of a constructive trust as the means of recognizing that certain assets, regardless of their original legal titling, are co-owned and therefore part of the marital estate to be divided equally under the premarital agreement.

---

[22] See *Martin v. Farber*, 68 Md. App. 137, 510 A.2d 608 (1986). See, also, *Peden v. Peden*, 972 So. 2d 106 (Ala. Civ. App. 2007); *Leathers and Leathers*, 98 Or. App. 152, 779 P.2d 619 (1989).

[23] See Caryl A. Yzenbaard et al., Bogert's The Law of Trusts and Trustees § 471 (3d ed. 2009).

[24] *Dreesen Enters. v. Dreesen*, 308 Neb. 433, 954 N.W.2d 874 (2021); *Wait v. Cornette*, 259 Neb. 850, 612 N.W.2d 905 (2000).

[25] *Wait v. Cornette, supra* note 24.

[26] *Dreesen Enters. v. Dreesen, supra* note 24.

### (b) Evidence Supporting Constructive Trust

Jonathan alternatively asserts that the court erred in finding the evidence presented at trial supported a constructive trust and that thus, it misused the vehicle of a constructive trust to adjust the general equities between the parties. We review a court's determination of a constructive trust de novo on the record, giving consideration to the fact that the trial court observed the witnesses and accepted one version of facts rather than another.[27]

[16-21] In determining whether to impose a constructive trust, the court will consider not only the original situation but also all events which have occurred since the defendant began to hold inequitably.[28] A party seeking the remedy of a constructive trust has the burden to establish the factual foundation, by evidence which is clear and convincing, required for a constructive trust.[29] However, it has been said that the constructive trust doctrine is equitable in nature and should not be rigidly limited and that the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity.[30] We have explained that where a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation.[31] Equity is not a rigid concept, and its principles are not applied in a vacuum.[32] Equity is determined on a case-by-case basis when justice and fairness so require.[33]

[22,23] Generally, a court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee

---

[27] See *ProData Computer Servs. v. Ponec, supra* note 3.

[28] See Yzenbaard, *supra* note 23.

[29] *Dreesen Enters. v. Dreesen, supra* note 24.

[30] *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341 (2d Cir. 1992).

[31] *Anderson v. Bellino*, 265 Neb. 577, 658 N.W.2d 645 (2003).

[32] *Manker v. Manker*, 263 Neb. 944, 644 N.W.2d 522 (2002).

[33] *Id.*

of the legal title for property unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that, under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.[34] A constructive trust is imposed to do equity and to prevent unjust enrichment.[35]

[24,25] We have explained that unjust enrichment is a flexible concept,[36] occurring when a claim is based on the failure of consideration, fraud, or mistake and in other situations where it would be morally wrong for one party to enrich himself or herself at the expense of another.[37] We have explained in the context of a constructive trust that "fraud" comprises all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.[38] Similarly, with respect to "confidential relationship," it has been said that "[e]quity has never bound itself by any hard and fast definition of the phrase 'confidential relation' and has not listed the necessary elements for such a relationship to exist but rather has reserved discretion to apply the doctrine whenever it believes that a suitable occasion has arisen,"[39] but "[o]ften the parties are related by blood or marriage and that relationship when coupled with the status of the parties as to health, age,

---

[34] *Dreesen Enters. v. Dreesen, supra* note 24.

[35] *Vogt v. Town & Country Realty of Lincoln, Inc.*, 194 Neb. 308, 231 N.W.2d 496 (1975).

[36] *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011).

[37] *In re Graphics Technology, Inc.*, 306 B.R. 630 (8th Cir. 2004).

[38] See *Fisher v. Keeler*, 142 Neb. 728, 7 N.W.2d 659 (1943).

[39] Yzenbaard, *supra* note 23, § 482 at 281.

education, and dominance may lead a court to find that a confidential relationship exists."[40]

Only a few cases in Nebraska have addressed constructive trusts in property accumulated during a marital or similar relationship.

In *Manker v. Manker*,[41] we affirmed the imposition of a constructive trust upon one half of the personal property titled solely in the name of the ex-husband whom the plaintiff mistakenly believed she was still married to.[42] The parties cohabitated for 19 years and held themselves out to be married. Less than a year after the parties were married, the defendant filed a petition for dissolution and then falsely told the plaintiff he had dismissed the action when, in reality, he received a default judgment. Believing them to be married, the plaintiff allowed the defendant to handle all the couple's finances and control all the assets. While occupying a "superior position in the relationship," the ex-husband placed nearly all of the property accumulated during their cohabitation in his sole name.[43] These facts, we said, supported the district court's finding of a constructive trust. Moreover, while the plaintiff had learned more than 4 years before bringing the action that she was not married to the defendant, we affirmed the lower court's conclusion that the defendant, who had acted inequitably and dishonestly and cajoled the plaintiff into delaying any action, could not rely on the statute of limitations as a defense.

In contrast, in *Dreesen Enters. v. Dreesen*,[44] also involving a cohabitating relationship that continued after the parties' divorce, albeit only sporadically, we affirmed the court's denial of a constructive trust against the ex-husband's corporation for

---

[40] *Id.* at 292-93.

[41] *Manker v. Manker, supra* note 32.

[42] See, also, *Blome v. Blome*, 201 Neb. 687, 271 N.W.2d 466 (1978); *Workman v. Workman*, 174 Neb. 471, 118 N.W.2d 764 (1962).

[43] *Manker v. Manker, supra* note 32, 263 Neb. at 962, 644 N.W.2d at 537.

[44] *Dreesen Enters. v. Dreesen, supra* note 24.

one-half of the value of a house the ex-wife was living in and where, for awhile, the ex-husband also lived.[45] The lower court ultimately found more credible the ex-husband's testimony that he had fully disclosed to the ex-wife that the subject property would be titled solely in his company's name, that the parties had explicitly agreed the ex-wife would pay rent to live there, and that $50,000 for the downpayment provided by the ex-wife was, under the parties' express oral agreement, merely a bridge loan. We affirmed the lower court's monetary judgment in favor of the ex-wife for the unpaid $50,000 loan.

Similarly, in *Peterson v. Massey*,[46] we affirmed the court's denial of a constructive trust, given the dearth of evidence presented by the decedent wife's heirs from a prior marriage to support their claim to one half of the widower husband's farm under the theory that the couple had orally agreed to enter into a partnership. There were no allegations of wrongdoing or of dominance or disparities in health, age, or education. The evidence consisted only of statements by the husband referring to the farm as "'our'" property and saying "'[i]t's your's as well as mine,'"[47] a one-time contribution by the wife of $750 in capital and goods, and the fact that the wife had occasionally worked in the field.

Cases from other jurisdictions provide further illustration of when and how constructive trusts are imposed in favor of a spouse upon closely held business enterprises.

In *Janke v. Janke*,[48] the appellate court affirmed the lower court's imposition of a constructive trust in half of a tavern business titled solely in the husband's name.[49] Both parties

---

[45] See, also, *Wells v. Wells*, 3 Neb. App. 117, 523 N.W.2d 711 (1994).

[46] *Peterson v. Massey*, 155 Neb. 829, 53 N.W.2d 912 (1952).

[47] *Id.* at 833, 53 N.W.2d at 915.

[48] *Janke v. Janke*, 47 A.D.2d 445, 366 N.Y.S.2d 910 (1975).

[49] See, also, e.g., *West v. Christensen*, 576 B.R. 223 (D. Utah 2017); *Brown v. Odom*, 425 S.C. 420, 823 S.E.2d 183 (S.C. App. 2019); *Keeney v. Keeney*, 223 S.W.3d 843 (Ky. App. 2007); *Levin v. Levin*, 43 Md. App. 380, 405 A.2d 770 (1979); *Genter v. Genter*, 270 So. 2d 388 (Fla. App. 1972).

were signatories to the bank loan used for its purchase, it was the parties' intention to operate the tavern as a husband and wife operation, the wife worked extensive hours at the tavern, the husband's salary and a small inheritance by the wife were contributed to the business, and all family needs were paid for by business proceeds. The court explained that though a promise in words might have been lacking, the promise underlying the constructive trust may be implied. "The understanding of the parties should be interpreted not literally and irrespective of its setting but sensibly and broadly with all its reasonable implications."[50] Under the facts of the case, noted the court, "the entire relationship and the actions and contributions made by both parties were instinct with a mutual promise of a joint endeavor for the benefit of both."[51] In other words, "[t]he absence of any express promise formalizing the venture grows out of the very confidence and trust implicit in the marriage relationship."[52] The court concluded that it would constitute unjust enrichment to permit the husband to retain for himself all of the business assets to which each contributed and which each rightfully expected to share.

In *Leathers and Leathers*,[53] the court likewise affirmed an award to the wife of an undivided one-half interest in properties purchased by the business titled solely in the husband's name.[54] It did so despite a valid antenuptial agreement assigning to the husband all property owned by the husband or thereafter acquired "'by any means whatsoever.'"[55] The court found that the evidence supported a partnership in the business and that the property purchased when the business was titled solely in the husband's name was therefore held

---

[50] *Janke v. Janke, supra* note 48, 47 A.D.2d at 448, 366 N.Y.S.2d at 914.

[51] *Id*.

[52] *Id*., 47 A.D.2d at 448-49, 366 N.Y.S.2d at 914.

[53] *Leathers and Leathers, supra* note 22.

[54] See, also, *Scull v. Scull*, 94 A.D.2d 29, 462 N.Y.S.2d 890 (1983).

[55] *Leathers and Leathers, supra* note 22, 98 Or. App. at 155, 779 P.2d at 620.

in partnership by the parties. The evidence of the partnership was that the business was later changed to a jointly owned proprietorship that held 80 percent of the company assets, the wife worked for the business without compensation for 22 years, the wife was consulted before purchasing any property, the wife was registered with the commissioner as a "co-proprietor," and the wife was held out to employees as a co-owner of the business.[56]

In a somewhat similar case, *Scull v. Scull*,[57] the court imposed a constructive trust based on an implied agreement of a joint venture, noting that "an agreement for joint venture between spouses is rarely spelled out in writing" and can be implicit. Such promises within the confines of a marital association combined with independent evidence "of a pattern or a lifestyle indicating that the parties were engaged in a joint venture," when combined with unjust enrichment, were sufficient to establish a constructive trust in that case.[58]

In contrast, under the facts presented in *Turner v. Turner*,[59] the court found the evidence insufficient to impose a constructive trust in 50 percent of a closely held corporation and affirmed the lower court's determination also so finding. The business in question was a lighting business that had evolved from the husband's childhood hobby. The husband was the president, owning 65 shares of its stock. His technical knowledge and skill, noted the court, were crucial to the business' success. The wife held 10 shares of the stock. The wife performed many tasks for the business but was compensated at a significantly higher salary than the salary drawn by the husband.[60] During the marriage, the parties discussed the wife's desire to hold more stock and, despite her explicit requests,

---

[56] *Id.* at 158, 779 P.2d at 622.

[57] *Scull v. Scull, supra* note 54, 94 A.D.2d at 34, 462 N.Y.S.2d at 893.

[58] *Id.*

[59] *Turner v. Turner*, 147 Md. App. 350, 809 A.2d 18 (2002).

[60] *Id.*

there was no evidence her husband ever promised to give her an equal number of shares.[61]

The district court observed Heather's and Jonathan's testimonies and accepted one version of facts rather than another. Viewing the evidence in that light, we find the evidence more similar to those cases finding support for a constructive trust than to those that do not. Heather testified as to an implied promise or understanding between her and Jonathan that they were acquiring a business with their joint savings and that they were going to run the business together. She noted that they had worked together since the day they had met and have the same work ethic, so it was always their long-term goal to find their own business that both of them could have an active role in. The parties had in fact accumulated from their joint earning $188,000 in their joint bank account at the time of the initial purchase of Backyard Adventures, and Heather had no idea that there was a substantial gift utilized for the purchase such that only $65,000 from their joint account ultimately was used.

Jonathan represented to Heather, employees, and the public at large that they were co-owners of the business. Heather was designated as "[o]wner" on business cards and signage, and she was a cosignatory on JBS Kids Play's account. Heather contributed a substantial amount of labor over the years with minimal pay, which Jonathan described as a way of having staff without having expense. Additionally, Heather contributed toward the growth of the business by being the public face of the venture, working the "front of the store," and through marketing events and her ideas that expanded the business' offerings to the public and maximized the layout of their showroom and party rooms. She claimed that Jonathan had told her he could not run the business without her.

Both parties testified that Jonathan handled the parties' finances and sorted through their mail. All family needs were

---

[61] See *id.*

paid by business proceeds. Heather described a "traditional" spousal relationship where Jonathan handled their accounting. Heather stated, "[H]e was very dominant and 'I'm the man' type person, and I allowed it, I guess." Despite not signing the relevant paperwork, Heather testified she did not suspect at any point during the marriage that she was not in fact a co-owner of Backyard Playworld. Jonathan, with the help of attorneys and without Heather's knowledge, crafted several LLCs in his own name. The family needs were paid for almost exclusively by business proceeds, although a significant amount of proceeds were left as cash assets in the business accounts titled solely in Jonathan's name. The family was also supported in small part by cash gifts to Heather, which were deposited into the parties' joint account. Only after the divorce action was filed did Heather learn that "this whole time he'd been lying to me, he'd been using me, he had been completely taking advantage of my trust in him, and it was all a lie."

Jonathan focuses on Heather's prior experience at a car dealership as evidence that she should have known she was not a co-owner because she did not sign any paperwork. In cases where a constructive trust is imposed on a business venture titled in only one spouse's name, some paperwork is usually involved that the plaintiff spouse is aware of. This is but one circumstance for a court to consider in determining whether equity requires the imposition of a consructive trust. There is little support for the premise that the plaintiff spouse should be foreclosed from a constructive trust claim simply because that spouse has some knowledge of paperwork involved in the formation of the subject business venture, which the plaintiff spouse did not sign. We defer to the trial court's determination that, despite knowing she did not sign certain paperwork, Heather did not have actual knowledge she was not a co-owner. The court did not err in determining that, under all the relevant circumstances, the equities lay with Heather.

The evidence was sufficient to show a confidential relationship under which Heather contributed to and rightfully

expected to share in the business as a partner or co-owner. There was an implied promise of a joint venture that Jonathan did not act in accordance with when he surreptitiously orchestrated several LLCs in his sole name. The evidence was sufficient to prove Jonathan would be unjustly enriched if he were allowed to keep for himself the benefit of Heather's substantial contributions to the business made under that understanding between them. Viewing the evidence de novo, but with consideration for the fact that the district court observed the witnesses and accepted one version of facts rather than another, we conclude that Heather established the factual foundation, by evidence which is clear and convincing, required for a constructive trust. The district court did not err in finding the evidence sufficient to support the imposition of a constructive trust in one-half of Backyard Playworld.

Jonathan asserts the court erroneously made a finding that he told Heather there was no need to sign paperwork because the purchase of Backyard Adventures was going to be a cash transaction. This finding appears to be derived from Heather's cross-examination, wherein she was questioned as to why she did not suspect she was not a co-owner by virtue of the fact that she was not asked to sign anything during the closing of the purchase of Backyard Adventures. She explained that "we were paying cash, so [Jonathan] signed, and [I] trusted my husband's word." The court also refers in its order to closing arguments and "proposed findings," which are not in the appellate record. As we have already explained, the failure to sign the paperwork was at best marginally material to the overall question of whether Heather proved a constructive trust. The technical misstatement in the court's order does not call into question its ultimate finding of a constructive trust.

Jonathan similarly takes issue with the court's statement in its order that "Backyard Playworld was originally purchased by [Jonathan] and [Heather] as Backyard Adventures, Inc." He argues there is no support for this finding in any witness statement or document from the trial record. It appears from the

context that the court was well aware that Backyard Playworld was not legally purchased by both parties. We understand this statement as referring to the understandings and representations that led to the imposition of the constructive trust. This also is not sufficient grounds to call into question the court's judgment.

### (c) Consistency With Waiver Provision of Premarital Agreement

[26] Jonathan raises for the first time in this appeal the argument that establishing title under a constructive trust was prohibited by section 6 of the Premarital Agreement, wherein each party agreed "he or she will not make any claim of any kind to the property of the other in the event of death, dissolution of marriage, or separation except as specifically contemplated by the provisions of this Agreement." The section also states, "[E]ach party waives all rights he or she may have in all or any part of the property of the other under any law . . . whether by way of dissolution of marriage . . . or any other right or interest." This section was not specifically addressed by the court. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court.[62]

In any case, we do not read this provision as prohibiting Heather from claiming title through a constructive trust. Unlike other rights to someone else's property, which are established under laws such as the homestead allowance,[63] a constructive trust does not give rights to the property of another; it establishes who actually owns the property. The constructive trust established that the Backyard Playworld LLCs were never the sole property of Jonathan; rather, title to the LLCs were equally Jonathan's and Heather's. Heather's waiver of any rights to Jonathan's property under section 6 and other provisions of the premarital agreement is therefore consistent with the district court's order.

---

[62] *de Vries v. L & L Custom Builders*, 310 Neb. 543, 968 N.W.2d 64 (2021).

[63] See Neb. Rev. Stat. § 30-2322 (Reissue 2016).

### (d) Mention of Statute of Limitations

[27,28] Jonathan also raises for the first time on appeal the statute of limitations in relation to the constructive trust. He does so not in his assignments of error but only in passing in the argument section of his appellate brief concerning the alleged unfair surprise of the possibility of a constructive trust. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[64] A statute of limitations is nonjurisdictional and waivable.[65] As the statute of limitations was not presented to or passed upon below and was not specifically assigned, or clearly argued, on appeal, we will not address in this appeal any question of the statute of limitations as pertains to the constructive trust.

### (e) Fair Value Versus Fair Market Value

We turn to Jonathan's challenge to the monetary value of the LLCs upon which the constructive trust was imposed. Jonathan argues the court erred in accepting the valuation by Heather's expert, who utilized fair value rather than fair market value in making that valuation. Jonathan did not seek to exclude Harr's testimony, and he did not object to Harr's opinion that fair value was a more accurate valuation approach for divorces. Jonathan states on appeal that the "problem" with using fair value is its failure to contemplate minority discounts and discounts for lack of marketability, but he concedes that "[t]rial courts should have the discretion to reject or apply such discounts in the divorce context, to be sure."[66] While Jonathan's arguments respecting fair value versus fair market value are somewhat unclear, we view the issue preserved below and presented to us on appeal as an attack on the weight the court accorded Harr's opinions as opposed to their admissibility.

---

[64] *Diamond v. State*, 302 Neb. 892, 926 N.W.2d 71 (2019).

[65] *State v. Wiemer*, 3 Neb. App. 821, 533 N.W.2d 122 (1995).

[66] Brief for appellant at 46.

[29,30] Even in equity actions, which are generally subject to de novo review, we have said that the determination of the weight that should be given expert testimony is uniquely the province of the fact finder.[67] And we have also said in this context that a trial court is not required to accept any one method of valuation as more accurate than another accounting procedure.[68] We have held that a trial court's valuation of a closely held corporation is reasonable if it has an acceptable basis in fact and principle,[69] and there is no reason to hold the valuation of an LLC to a different standard.

We hold that the district court did not abuse its discretion in the weight it accorded Harr's expert opinion. Heather's and Jonathan's experts' opinions as to the proper method of valuation under the circumstances of this case were in conflict, and the district court gave more weight to Harr's testimony, which had an acceptable basis in fact and principle. The court's valuation of Backyard Playworld was reasonable. It did not err in valuing Backyard Playworld in accordance with Harr's fair value methodology.

Jonathan argues somewhat abstractly that "experts should be required to articulate their opinions" about discounts and that "falsely claiming" fair value has been used in Nebraska divorce cases as "at best, a clever way to avoid cross-examination on your failure to intellectually address important valuation issues" and "[a]t worst," the presentation of an "artificially inflated business value in the hopes that a court might 'bite' if not conversant with business valuations."[70] But we observe that Jonathan's own expert, Morris, testified that both fair value and fair market value were commonly accepted practices and that he had seen both types of valuation utilized in divorce cases.

---

[67] See *Anderson v. A & R Ag Spraying & Trucking*, 306 Neb. 484, 946 N.W.2d 435 (2020).

[68] See, *id.*; *Bryan v. Bryan*, 222 Neb. 180, 382 N.W.2d 603 (1986).

[69] *Id.*

[70] Brief for appellant at 46.

Further, Harr did in fact articulate his opinions about the use of discounts in a dissolution case, such as this one, where the sale of the business is not being contemplated. We find no support for Jonathan's apparent argument that Harr's testimony was impermissibly misleading.

### (f) $375,000 Gift

Next, Jonathan argues the court should have, at a minimum, set off the $375,000 gift that his parents contributed toward the purchase of Backyard Playworld and considered it part of Jonathan's personal property for purposes of the division of assets. Jonathan's only support for this assertion is the general proposition that under equitable division, a marital estate does not include property that a spouse has acquired before the marriage or by gift or inheritance.[71] However, the $375,000 became part of Backyard Playworld, the division of which was governed by the premarital agreement and the constructive trust, not equitable division governed by § 42-365.

[31] Jonathan fails to make any argument under the law of constructive trusts that the gift utilized toward the purchase price of Backyard Adventures should be set off as Jonathan's personal property. The money was deposited directly into the account held by JBS Kids Play. Jonathan's parents did not intervene in the action to claim any interest therein; rather, it was undisputed that it was a gift. The ownership rights of a constructive trust beneficiary, once recognized, are protected from the moment the trustee acquired legal title, the constructive trust decree being in the nature of a declaratory judgment about the state of title to the property.[72] Thus, the gift was to the jointly owned business. We have already held in our de novo review that the constructive trust was not in error, and we do not find reason to set off from that trust the amount of the $375,000 gift to the LLC.

---

[71] See *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020).

[72] See Restatement (Third) of Restitution and Unjust Enrichment § 55, comment *e.* (2011).

### (g) Truck

Jonathan argues that the truck owned at the time of filing for divorce, and valued at $57,141, should not have been calculated as part of the marital estate because it was owned by the corporation and therefore was already included in the constructive trust that was given a separate value. It was undisputed at trial that the truck was titled in the name of the business. The court found the truck became part of the marital estate pursuant to section 4.6 of the premarital agreement. And from the court's calculations dividing the marital estate, it is clear the court awarded the value of the truck to be divided twice, once as part of the constructive trust and again as separately listed marital property. We agree with Jonathan that this was in error. That part of the order itemizing the truck as part of the marital estate is vacated.

### 3. Lump-Sum Payment Under Agreement

The court explained that the sum of $981,180 to equalize the division of the marital estate did not include the $150,000 owed under section 3.3(b) of the premarital agreement. Jonathan takes issue with the court's order awarding the agreed-upon property equalization lump-sum payment in addition to the constructive trust. He presents no law to support this argument. Nor does he appeal to the terms of the premarital agreement in relation to the lump sum. Rather, in a brief argument, Jonathan characterizes the court's order of a lump sum in addition to the constructive trust on Backyard Playworld as turning "the divorce decree into a kind of Frankenstein of contract and equity."[73]

The premarital agreement in section 3.3 sets forth that Heather waived "any and all claims for division of property or property settlement from [Jonathan] *with respect to* [*Jonathan's*] *Property* in the event of a future legal separation, divorce, annulment or other dissolution of this proposed marriage" in exchange for a lump sum of money

---

[73] Brief for appellant at 45.

based on the number of "Full Years of Marriage Subsequent to Marriage Date," which, in this case of the marriage ending after between 10 and 15 years of marriage, is $150,000. (Emphasis supplied.) As already discussed, the constructive trust means that title to the Backyard Playworld LLCs is held in co-ownership. The premarital agreement contemplated the lump-sum settlement to be made in addition to the equal division of the marital estate, which included assets held in co-ownership. What was waived was Heather's right to an equitable share in property solely owned by Jonathan which, due to the constructive trust, the LLCs were not. We disagree with Jonathan's assertion that the court's enforcement of the lump-sum settlement was improper.

### 4. ALIMONY AWARD

Jonathan argues on appeal that the award of alimony was an abuse of discretion because it was excessive. He makes no argument that Heather's right to alimony was waived in the prenuptial agreement. In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.[74]

Under § 42-365, "The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate." The court may order payment of such alimony by one party to the other as may be

> reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful

---

[74] See *Vanderveer v. Vanderveer, supra* note 4.

employment without interfering with the interests of any minor children in the custody of such party.[75]

[32] Accordingly, we have articulated four factors that are relevant to alimony: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.[76] In addition, a court should consider the income and earning capacity of each party and the general equities of the situation.[77] Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award.[78] The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.[79]

[33] In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result.[80] The ultimate criterion is one of reasonableness.[81] An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.[82]

Heather does not have a college degree. She has not worked outside the home anywhere other than at Backyard Playworld since the birth of the oldest child of the marriage

---

[75] § 42-365.

[76] See *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021).

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

approximately 12 years prior to the hearing. The child support calculator entered into evidence without objection showed Jonathan's monthly net income as $31,154 and Heather's monthly net income as $1,098. Other evidence showed that Jonathan had a net cashflow for 2019 of $590,990.37, derived from the Backyard Playworld LLCs, as well as various investment accounts. Before having children, Heather worked at a car dealership where she earned approximately $95,000 per year her final 2 years at that job. In previous years, she had earned around $70,000 annually. Heather did not think she could go back to sales work at a car dealership due to her obligations caring for the children and because of the use of newer technology that she has no experience with. Heather submitted a list of her monthly living expenses totaling $13,630.

The district court found that based on this evidence and considering the factors in § 42-365, Jonathan should pay alimony in the sum of $5,500 per month for 72 months. Jonathan's argument challenging this alimony award is that the constructive trust based on Heather's being a former "dynamic and energetic leader and owner" of Backyard Playworld is irreconcilable with an alimony award based on Heather's being a "homemaker" and "housewife."[83] According to Jonathan, Heather "cannot be both."[84] If Heather is a business leader then, according to Jonathan, "she has the talent and acumen to earn a substantial income and the alimony claim cannot stand."[85] We find no merit to this argument. Under the evidence presented and arguments made, we cannot conclude that the court's award of alimony was patently unfair.

### 5. LIFE INSURANCE TO FUND SUPPORT

Lastly, Jonathan argues that the court's order that he maintain life insurance covering his support obligations is inconsistent

---

[83] Brief for appellant at 47.

[84] *Id.*

[85] *Id.*

with the premarital agreement. He asserts that because of the court's order, he is being required to maintain an additional life insurance policy beyond that required by the agreement. Heather responds that the premarital agreement does not require Jonathan to maintain this life insurance after the dissolution of the marriage.

Section 1.6 of the premarital agreement sets forth Jonathan's obligation to carry life insurance during the marriage in the amount of at least $1 million; however, Heather is correct that it provides:

> In the event of the parties' legal separation or dissolution of the proposed marriage while said life insurance policy is in effect, the parties agree any case value attributable thereto shall be equally divided between them, and Heather at her election, shall be entitled to retain such policy at her sole cost and expense.

While Jonathan points out that he testified at trial that he was maintaining life insurance in accordance with the premarital agreement, this provision is plain that the agreement no longer obligates him to do so upon the dissolution of the marriage. Thus, the court's decree does not impose upon Jonathan a life insurance obligation that is duplicative of an obligation imposed under the agreement. We find no merit to this assignment of error.

## VI. CONCLUSION

We affirm the decree in all respects with the exception of the court's itemization of the truck as part of the marital estate, which we vacate. The truck is part of the constructive trust.

AFFIRMED IN PART, AND IN PART VACATED.

CASSEL, J., concurring.

Lest the bar and trial bench misunderstand the court's decision—believing that it sanctions the remedy of a constructive trust in run-of-the-mill marital dissolution actions—I write separately. I address two aspects.

First, the application here was driven by the enforcement of a premarital agreement. The parties utilized a premarital agreement to circumvent (at least partially) the principles of equitable division of property dictated by the dissolution statutes.[1] Had they not done so, I suggest that a constructive trust would have had no application. In other words, where parties bring individual property to a marriage and do not attempt to use a premarital agreement regarding division of property, the division of property would be controlled solely by §§ 42-365 and 42-366 and our decisions construing those statutes.

Second, I have considerable doubt that the remedy of a constructive trust would apply to parties' actions prior to marriage. In the absence of a premarital agreement, the status of property brought to a marriage is governed by the first step of a three-step process.[2] The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property to the party who brought the property to the marriage.[3] Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.[4] The burden of proof rests with the party claiming that property is nonmarital.[5] Here, the disputed property was not "property brought to a marriage."[6] Today's decision should not be misunderstood as precedent for applying a constructive trust in the first step of the three-step process. It is not necessary to consider the issue here, and I do not understand the court's opinion as doing so.

With this understanding, I join the court's opinion.

---

[1] See Neb. Rev. Stat. §§ 42-347 to 42-381 (Reissue 2016 & Cum. Supp. 2020).

[2] See *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021).

[3] *Id*.

[4] *Id*.

[5] *Id*.

[6] See *id.*