IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STEVISON V. STEVISON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SHALAIA C. STEVISON, APPELLEE,

V.

NATHAN G. STEVISON, APPELLANT.

Filed January 31, 2023.   No. A-22-318.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge.
Affirmed.

Eddy M. Rodell for appellant.

Corey Wasserburger and Ellie K. Hobelman, Senior Certified Law Student, of Johnson,
Flodman, Guenzel & Widger, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and ARTERBURN, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Nathan G. Stevison appeals from a decree entered by the district court for Lancaster County
dissolving his marriage to Shalaia C. Stevison. Nathan takes issue with the court awarding Shalaia
custody of the parties' children, his amount of parenting time, and the court's failure to award him
alimony. Based on the reasons that follow, we affirm.

## BACKGROUND

Nathan and Shalaia were married in June 2008. The parties have three children together:
Kyra, born in 2004; Mohalla, born in 2007; and Liselle, born in 2011.

Nathan sustained a traumatic brain injury in 2016. He is permanently disabled and unable
to work as a result. One of the effects of the brain injury was short-term memory loss.

- 1 -

The parties separated in April 2020, and Shalaia filed a complaint for dissolution of marriage in November. While the case was pending, Shalaia was awarded temporary custody of the children.

Trial was held in March and April 2022. In lieu of calling the children to testify at trial, Kyra and Mohalla's therapist testified about their current mental state as well as their relationship with both parents. Shalaia also testified. Nathan was allowed to submit written affidavits in lieu of live testimony because of his disability. A friend of Nathan's also testified about Nathan's relationship with his children.

Shalaia testified that Kyra had identified as transgender for 8 years prior to trial. Kyra wants to be called "Dustin" and prefers "he/him" pronouns. Mohalla had identified as nonbinary for the 2 or 3 years prior to trial. She wants to be called "Rowan" and prefers "they/them" pronouns. Shalaia testified that she is open to the children's sexual identities, but had trouble initially calling the children by their preferred names and pronouns. Shalaia testified that Kyra's and Mohalla's gender identity has been a frequent source of conflict with Nathan. She testified that Nathan is also open to Kyra and Mohalla's sexual identities, but still struggled with using their preferred names and pronouns when speaking to them.

Shalaia testified that the household dynamic changed after Nathan's traumatic brain injury. Specifically, the children have told her about multiple incidents of abuse or neglect by Nathan, and the children had called the police on several occasions as a result.

Shalaia testified that the children called the police in 2017 after Nathan pulled Mohalla's sweatshirt over her head and dragged her across the floor. Shalaia also testified that on another occasion in 2017, the children locked themselves in the bathroom and called the police because Nathan and his brother were intoxicated and got into a physical altercation in front of the children. A safety assessment was performed following this incident, and no safety threats to the children were identified.

Shalaia further testified that in January 2018, the children called the police and reported physical abuse after Nathan force-fed Kyra vegetables and hit her head into the table. This resulted in a Child Abuse/Neglect Intake by the Department of Health and Human Services (Department) which concluded that no physical abuse occurred and no further action was taken. Shalaia stated that the incidents of alleged abuse that occurred prior to the parties' separation occurred while she was at work.

In November 2020, during the children's first visit with Nathan after the parties separated, Kyra called the police when there was an argument over the children's bedtime. Again, following a Child Abuse/Neglect Intake, the Department found no abuse or neglect and no further action was taken.

Additionally, Shalaia testified that there is much conflict in the relationship between Nathan and Kyra. She testified that Kyra does not like the rules at Nathan's home and at times she has been disrespectful to Nathan, who then disciplines her. Shalaia stated that Kyra struggles with the difference in rules between Nathan's home and her home.

In April 2021, Kyra and Mohalla began individual counseling with Jordan Graham, a provisionally licensed mental health practitioner and clinical social worker. In March 2022, Graham began providing family therapy for Nathan and Mohalla. Part of the focus of family therapy was to work on the conflict in the different rules and schedules between households.

Graham testified that the family therapy sessions were complicated by Nathan's short-term memory issues due to his brain injury.

Kyra refused to participate in family therapy sessions with Nathan. Kyra expressed to Graham that she was uncomfortable with and felt unsafe with Nathan. Graham stated that Kyra also had difficulty accepting Nathan's way of parenting and his understanding of her transgender identity.

Both Kyra and Mohalla have mental health issues, including anxiety, depression, and suicidal ideations, which had resulted in each of them being hospitalized in the past. Both are on prescription medication for mental illness. Graham testified that Nathan's short-term memory loss causes her concern for Kyra and Mohalla's safety during visits. Specifically, she questioned Nathan's ability to make sure the children are taking their medication as prescribed and his ability to get them medical help should the need arise. She further testified that Kyra and Mohalla's relationship with Nathan at the time of trial was also a safety concern because it had been a source of stress and further exacerbation of their mental health issues.

Additionally, both Kyra and Mohalla have told Graham they were not comfortable talking to their father about their mental health issues. Graham was concerned Nathan may not recognize if one of them was having an episode and intervene. Graham testified that she was working with Kyra and Mohalla to help them understand Nathan's brain injury and how it had affected him, and to understand that their relationship with him would be different than before his injury.

Both Kyra and Mohalla expressed to Graham that they were not comfortable having overnight visits with Nathan. Mohalla told Graham she wants to rebuild a relationship with her father, but that forcing her into more time with him would be detrimental to the relationship. Graham testified that forcing visits with Nathan will intensify Kyra and Mohalla's mental health issues. Graham testified that Kyra has also expressed that she believed forcing her to have a relationship with Nathan would increase her mental health issues. Graham testified that she had seen positive changes in Mohalla's relationship with Nathan, but that the scheduled visits have caused the opposite result with Kyra.

Shalaia and Graham also testified about Kyra's desire to legally change her first name. Shalaia testified that Nathan told Kyra she could change her name if she and Mohalla started coming to visits with him. Graham also testified that Kyra told her that when she attempted to discuss changing her name with Nathan, he attempted to negotiate spending time with Kyra and Mohalla in exchange for allowing Kyra to change her name.

Shalaia testified that she encourages Kyra to go to visits with Nathan, but Kyra does not want any relationship with Nathan. She also testified that she supports the children spending time with Nathan, but at a level that everyone is comfortable with. She stated that Kyra and Mohalla are not limited to the set parenting time with Nathan and that if they want to see Nathan more they can.

Shalaia testified that Nathan has a good relationship with Liselle. Nathan would take Liselle to Cub Scouts on a weekly basis and had regular visits with her. While the case was pending, the parties had been flexible with working out parenting time between Nathan and Liselle, and Shalaia testified that she believed that could continue in the future.

At the time of trial and for the past few years, Shalaia was earning around $30,000 per year. At the time of trial, she was employed by Cancer Partners of Nebraska as a "coordinator" and by

Bryan Health as a "PRN" doing instrument management and sterilization. Shalaia was also receiving Social Security Disability Benefits on behalf of the minor children as a result of Nathan's disability. Nathan had been ordered to facilitate the transfer of the children's benefits to her in the beginning of 2021, but she did not start receiving the benefits until August 2021. She was receiving $146 per child per month. All three children had been living with Shalaia since April 2020. Nathan did not provide any financial support for the children between April 2020 and August 2021.

While the case was pending, Shalaia paid for Liselle's before and after school care. She did not ask Nathan to pay for any portion of Liselle's child care expenses or any other child support outside of the disability benefits. The children were on Medicaid for health insurance.

Nathan testified that before his brain injury, he supported the family with his earnings, while Shalaia worked at low-paying jobs and depended on him for support. He also stated that in the early days of their relationship he supported Shalaia by working multiple jobs and overtime, while she went back to school for a degree that she never finished. He testified that 6 months before the parties' separation, the parties agreed that Shalaia would pay the parties' utilities and Nathan would make the mortgage payments on their home. When Shalaia moved out, he discovered that she had not made any payments, leaving him with shut-off notices for the utilities. At the time of trial, he was still trying to pay off the past due bills.

Nathan testified that Shalaia was making more money at the time of trial than she ever did when they were together. He stated that her income was $3,000 per month and his was $1,000, and that his expenses exceeded his monthly income. He asked to receive a fair amount of alimony.

Nathan offered a rebuttal affidavit in which he addressed various accusations made against him by Shalaia during her testimony at trial. He denied that he had ever been abusive to his family and that his traumatic brain injury has not changed that. He denied pushing Kyra's head into the table and explained that she tried to get up from the table after being told to stay and finish her dinner so he put his hand on Kyra's shoulder to stop her.

He also explained the incident where Kyra called the police after an argument about her bedtime. Nathan testified that he told Kyra to go to bed a half-hour earlier than her regular bedtime and to give him her phone. He stated that Kyra "flipped out" and called the police.

Nathan denied dragging Mohalla across the floor by her sweatshirt. He explained there was an occasion where Mohalla was refusing to do something she had been asked to do and she was lying limp on the floor. Nathan picked her up and carried her to a chair. Kyra called the police and the police did not find Mohalla's version of events to be truthful.

In regard to the argument with his brother, Nathan testified that he asked his brother to leave because he was intoxicated and not acting appropriate in front of the children. He told the children to go into the bathroom and told Kyra to call the police. The police came and took Nathan's brother to detox.

Nathan testified that Kyra is the only child who calls the police and it is always for "small things" or because of rules she does not want to follow. He again stated that he has never physically abused or put hands on his children. The investigations following reports of abuse were all unfounded and no further action was taken. He further testified that he makes the children abide by the same rules that he and Shalaia imposed when they were together, and that Shalaia has changed the rules at her house since the separation. Nathan also testified that Shalaia has alienated Kyra and Mohalla from him.

Nathan also denied that he tried to get parenting time with Kyra and Mohalla in exchange for allowing Kyra to change her name, as Shalaia and Graham suggested. Nathan stated that he told Kyra he wanted to discuss the name change in person and asked Kyra to bring Mohalla if possible so he could see both of them. He further stated that this occurred during the time he was not having any visits with Kyra or Mohalla.

Nathan stated that he loves his children regardless of their sexual orientation, but he wants Kyra and Mohalla to wait until they are adults before making any permanent changes to their bodies or names. He further stated that anytime he does not use Kyra or Mohalla's preferred name or pronouns it is not intentional, it is because he either misspoke or forgot.

A friend of Nathan's testified that Nathan is a good father and loves his children, and that his children have always been his main priority. He testified that before Nathan's brain injury, Nathan was involved with his children and had a good relationship with them. He noted that Nathan had been struggling to maintain a relationship with Kyra and Mohalla, but he was trying not to push the relationship on them.

Following trial, the court entered a decree awarding Shalaia legal and physical custody of the parties' children. It allowed Nathan parenting time with Liselle every Tuesday evening until Wednesday morning, and every other weekend. In regard to Kyra and Mohalla, it gave Nathan parenting time for 1 hour every Thursday evening, and 1 extra hour with Mohalla every Sunday. The court further provided that Nathan could have additional time with any of the children if they requested it. Nathan was not awarded any alimony.

## ASSIGNMENTS OF ERROR

Nathan assigns that the trial court erred in (1) awarding Shalaia sole legal and physical custody, (2) awarding him only limited parenting time, and (3) failing to award him alimony.

## STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

*Legal and Physical Custody.*

Nathan first assigns that the trial court erred in awarding Shalaia sole legal and physical custody of the parties' children and contends that joint legal and physical custody is in the children's best interests. When deciding custody issues, the court's paramount concern is the

child's best interests. *Smith v. King*, 29 Neb. App. 152, 953 N.W.2d 258 (2020). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. See *Smith v. King, supra*.

Nathan acknowledges that there have been conflicts in his relationship with Kyra and Mohalla, primarily due to his brain injury and their sexual transitions. He states that Kyra and Mohalla's solution to their issues with Nathan was to avoid him as much as possible. He contends that joint custody would make Kyra and Mohalla address the issues they have with Nathan and help them reestablish a relationship with Nathan. However, the evidence shows that such a custody arrangement would be detrimental to Kyra and Mohalla.

Kyra and Mohalla both have mental health issues and Graham testified that they should not be forced into spending more time with Nathan than they were comfortable with. She further testified that Kyra and Mohalla's relationship with Nathan at the time of trial had been a source of stress and aggravated their mental health issues.

At the time of trial, Kyra did not want to spend any time with Nathan, including family therapy. Kyra had expressed to Graham that she was uncomfortable with and felt unsafe with Nathan. Kyra also had difficulty accepting Nathan's way of parenting and his understanding of her transitioning.

Both Kyra and Mohalla expressed to Graham that they were not comfortable having overnight visits with Nathan. Mohalla told Graham she wants to build a relationship with her father, but that forcing her into more time with Nathan before she is ready would be detrimental to the relationship. Graham testified that forcing visits with Nathan would exacerbate Kyra and Mohalla's mental health issues. Kyra also told Graham that she believed forcing her to have a relationship with Nathan would increase her mental health issues. Graham had seen positive changes in Mohalla's relationship with Nathan but stated that the scheduled visits with Nathan had caused the opposite result with Kyra.

Graham testified that Nathan's short-term memory loss caused her concern for Kyra and Mohalla's safety during visits because of their mental health issues. Specifically, Graham had

concerns about Nathan's ability to make sure the children were taking their medication as prescribed, as well as his ability to recognize that they needed medical help, and to get them help.

There were also allegations of Nathan physically abusing Kyra and Mohalla. The parties provided different accounts and explanations of the alleged abusive incidents. The allegations were deemed unfounded by the authorities and no further actions were taken. There was also conflicting evidence in regard to the occasion when Nathan and his brother were arguing, as well as Mohalla and Nathan's discussion about Mohalla legally changing her first name.

Having reviewed the record de novo, we find the trial court's custody decision to be supported by the evidence. Nathan's request for joint custody would jeopardize Kyra and Mohalla's welfare and not be in their best interests. Accordingly, the trial court did not abuse its discretion by awarding legal and physical custody of the parties' children to Shalaia.

*Nathan's Parenting Time.*

Nathan next assigns that the trial court erred in awarding him limited parenting time with the children. The court awarded Nathan parenting time with Liselle every Tuesday evening until Wednesday morning, and every other weekend. In regard to Kyra and Mohalla, the court awarded Nathan parenting time for 1 hour every Thursday evening, and 1 extra hour with Mohalla every Sunday. This was essentially the same arrangement followed while the case was pending. The court further provided that Nathan could have additional parenting time if a child requested it. Nathan was not given any additional parenting time during the summer months.

In regard to Kyra and Mohalla, Nathan again acknowledges that his relationship with them has eroded, but he contends that awarding him more parenting time would ultimately lead to a better relationship. However, as previously discussed, both children have mental health issues and their relationship with Nathan had been a source of stress and further aggravated their mental health issues. Graham testified that they should not be forced into spending more time with Nathan than they were comfortable with. We also note that Shalaia testified that Kyra and Mohalla are aware that if they decide they want to spend additional time with Nathan, they can contact him and make arrangements to do so. She stated they are not limited to the parenting time set forth in the parenting plan.

In regard to Liselle, there was no dispute that Nathan has a strong bond and good relationship with her. Shalaia testified that she had been flexible in regard to Nathan spending time with Liselle while the case was pending, and that she would continue to be flexible.

We conclude the trial court did not abuse its discretion in the amount of parenting time awarded to Nathan. This assignment of error fails.

*Alimony.*

Nathan's final assignment of error is that the trial court erred in failing to award him alimony. Under Neb. Rev. Stat. § 42-365 (Reissue 2016), "[t]he purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate." The court may order payment of such alimony by one party to the other as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and

interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Id.*

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. The ultimate criterion is one of reasonableness. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

Nathan contends that in addition to the established alimony considerations, the court should have considered Neb. Rev. Stat. § 42-362 (Reissue 2016), which allows the court in a dissolution action to order support and maintenance for a mentally ill spouse. We determine that Nathan's traumatic brain injury is a physical injury to the brain and not a mental illness and therefore, § 42-362 is not relevant here.

Nathan argues that the court erred in failing to award him alimony because Shalaia had a higher income than he did and because he is permanently disabled and unable to earn a reasonable wage. He further contends that prior to his injury he provided the primary financial support for the family, and after his injury he was the primary caretaker for the children.

In considering the alimony factors set out in *Simons v. Simons, supra*, the parties were married for 12 years before they separated. Nathan suffered a traumatic brain injury in 2016 and is disabled and unable to work as a result. His only income was $1,000 per month in disability benefits. There was no evidence of Nathan's specific physical or mental limitations, with the exception that he has short-term memory loss.

Nathan testified that prior to his injury he was the one who financially supported the family, and that Shalaia worked low-paying jobs and depended on him for support. He also testified that in the early days of their relationship he supported Shalaia by working multiple jobs and overtime, while she went back to school for a degree that she never finished. However, there was no evidence of his income or what types of jobs he held prior to his injury.

Shalaia's monthly income, based on the child support worksheet, was $2,666 per month at the time of trial. She was working two jobs to support herself and the three children. She had earned similar income in the past couple of years, but there was no other evidence of past income during the marriage or her earning capacity. She had been receiving disability benefits for the children related to Nathan's disability since August 2021 and would continue to do so under the decree until October 2029. However, the amount she receives will decrease when each child reaches the age he or she is no longer eligible for benefits. We also noted that Nathan had been ordered to transfer the benefits to Shalaia at the beginning of 2021, but this did not occur until August 2021. Nathan was not ordered to pay any child support until November 2029, after the disability benefits for all the children had ended. Nathan did not provide any financial support for the children between April 2020 and August 2021.

Having considered the alimony factors and the limited evidence related to those factors, we conclude the trial court did not abuse its discretion in failing to award Nathan alimony.

CONCLUSION

Based on the reasons above, we affirm the trial court's custody and parenting time award, as well as its decision to not award alimony. Accordingly, the dissolution decree is affirmed.

AFFIRMED.