IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE ESTATE OF LAHR

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ESTATE OF DIANNA K. LAHR, DECEASED.

RHONDA R. ULEMAN, APPELLEE,
V.

REBECCA J. GAFFNEY, APPELLANT.

Filed November 28, 2023.    No. A-22-766.

Appeal from the County Court for Douglas County: THOMAS K. HARMON, Judge. Affirmed.

Alton E. Mitchell, of Alton E. Mitchell Attorney at Law, L.L.C., for appellant.

Kelly Henry Turner and Andrew J. McElmeel, of Goosmann Law Firm, P.L.C., for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Rebecca J. Gaffney appeals from the order of the county court for Douglas County, which found that she had violated her duties as the personal representative of Dianna K. Lahr's estate and removed her as personal representative. On appeal, Gaffney assigns that the county court erred in ordering her to repay to the successor personal representative of the estate the sum of $114,677.07, in concluding she had breached any fiduciary duties as power of attorney or personal representative of the estate, in removing her as personal representative, and in not allowing her to close the estate. After our review, we affirm the order of the county court.

- 1 -

BACKGROUND

Gaffney served as the personal representative for the estate of her mother, Lahr, who died in July 2020. The inventory and tax determination worksheet Gaffney filed in this matter showed that the estate was to be divided evenly between Gaffney and her sister, Rhonda R. Uleman, the appellee. The filings showed each sister was to receive $114,677.07. In February 2022, Uleman filed a motion to remove Gaffney as personal representative of the estate, as well as an objection to the informal closing of the estate.

Gaffney filed a response in which she acknowledged that the total inheritance tax owed had erroneously been divided equally. Gaffney filed a request for an order nunc pro tunc which would reflect the proper division based upon a distribution of the estate to Uleman of $1,392.90. A trial was held on Gaffney's motion to close the estate, Uleman's objection thereto, and Uleman's motion to remove Gaffney as personal representative. The following evidence was adduced.

Lahr was the mother of Gaffney and Uleman. Gaffney and Uleman stopped speaking to each other sometime in 2009. In September 2010, Lahr executed a will which provided for an equal distribution of her assets between Gaffney and Uleman. Gaffney was nominated as personal representative of her mother's estate. Gaffney had been named Lahr's power of attorney in a document signed in 2010, and again in a document signed in 2020. The 2020 power of attorney specifically stated that

Except as otherwise authorized by the Power of Personal and Family Maintenance, an agent MAY NOT use my property to benefit the agent or a person to whom the agent owes an obligation of support unless I have included that authority in the Special Instructions or the Grant of Specific Authority.

(Emphasis in original.) There were no special instructions listed in the document, nor was there any grant of specific authority.

In July 2019, Lahr fell and had surgery. Following her rehabilitation, she was transferred to a long-term care facility. Lahr realized she would not be returning to live in her home and sold it in February 2020.

After March 7, 2020, the facility where Lahr was living would no longer allow outside visitors due to COVID-19, so when Gaffney or Uleman wanted to visit, they would go to the window outside of Lahr's room and call her on the phone. Upon receiving the check for the proceeds from the sale of the house, Gaffney took it to her mother and showed it to her through the window. Gaffney testified that Lahr told her to sign the check and give the proceeds to Dale Christensen, Lahr's financial advisor at UBS Financial Services, and he would know "what to do" with it. Gaffney endorsed the check, deposited it into Lahr's separate checking account, and then wrote another check to UBS. Gaffney testified that she signed Lahr's name on the checks acting as Lahr's power of attorney, although she did not designate on the checks that she was signing in that capacity. According to Gaffney, the only direction she gave Christensen was that the money needed to be available so Gaffney could pay Lahr's bills. She was unaware of whether Lahr had any conversations with Christensen regarding this account.

The signature page for the UBS account required both Gaffney's and Lahr's signature. It includes the account number, as well as a designation that the account is "Joint Ten W/Rights

Surv." Gaffney stated she did not review the whole document very well prior to signing it. Gaffney believed that both she and Lahr were listed on the account because Gaffney needed to be able to write checks out of it; however, she denied knowing that she would benefit from the account itself. She confirmed that she did not contribute any money into the account.

Emails between various employees at UBS were entered into evidence; the emails were dated between March 27 and April 2, 2020, and were marked as being associated with a separate retirement account Lahr had at UBS. The emails reveal that the employees were attempting to determine where Lahr was living, and in them, an employee referenced that she believed Christensen had spoken to Lahr "a few weeks ago," and that the employee had spoken with Gaffney "yesterday." That employee noted that "[Christensen] had me open a joint account [on March 26, 2020] with [Gaffney]." At trial, however, Christensen had no recollection of receiving a request to open a joint account with Lahr and Gaffney.

Lahr died in July 2020. Gaffney filed an application for informal probate of the will and, pursuant to its provisions, requested to be appointed personal representative, which was granted. On February 15, 2021, Gaffney filed an inventory, which listed five accounts Lahr had at the time of her death, including the UBS joint account, although no designation appeared on the inventory to designate that this account was jointly held. The total value of the estate was $260,816.89. The inheritance tax worksheet Gaffney filed on April 15 showed that Gaffney and Uleman would each receive $114,677.07 from the estate and divided the estate tax equally between the two. An August 17 check to Uleman, written from the estate bank account, notes that it is the final distribution to Uleman in the amount of $1,392.90.

Uleman testified that pursuant to her mother's will, the estate was to be equally divided between her and Gaffney; therefore, she was very surprised when she received the check for approximately $1,000. She stated that when she reviewed the inventory that had been filed reflecting an estate value of $260,816.89, she believed it to be accurate based on her knowledge of her mother's assets. Uleman confirmed her anticipated distribution, based on the inheritance tax worksheet, was $114,677, but that she never received that amount. Uleman stated when she called the attorney for the estate and asked about the discrepancy, she was told that she was not entitled to it.

Uleman testified that she had never received anything from Gaffney regarding the amount of time Gaffney had spent on the estate, nor did she receive anything from the attorney regarding his time spent. Uleman testified that despite requests for financial information about the estate, she never received anything. Gaffney confirmed that she did not provide Uleman with the documents filed with the court, nor did she provide her with an itemization of expenses. Gaffney stated she believed her attorney would have provided this information to Uleman.

Gaffney confirmed that after the inheritance tax had been paid, she thought the estate was being wound up, but that Uleman did not want to close the account, was "questioning everything," and had an attorney. Gaffney testified that she gathered the accounting and information about the estate to give them to Uleman's attorney. She gave the information to her attorney, and believed her attorney gave the information to Uleman's attorney. Gaffney testified that the check that had been written to Uleman was half of what had been left in Lahr's estate account after paying all of Lahr's outstanding bills; Gaffney distributed the same amount to herself from that account.

The county court specifically found that Uleman was generally credible, but that Gaffney was not credible on several issues. The county court found that Gaffney breached her fiduciary duties by overstepping the bounds of the power of attorney entrusted to her. It determined that Uleman provided sufficient evidence to prove that removal would be in the best interest of the estate and that Gaffney had made material and substantive misrepresentations regarding her management of the estate and its assets and failed to perform certain duties of her office. It found that Gaffney was not suitable to continue to serve as personal representative and appointed a successor personal representative. Gaffney was ordered to repay the successor trustee the sum of $114,677.07 to be held in a constructive trust. Gaffney appeals.

## ASSIGNMENTS OF ERROR

Restated and renumbered, Gaffney assigns that the county court erred in (1) finding that she had breached the powers given to her by the power of attorney in her handling of the proceeds from the sale of the house and in ordering her to pay $114,677.07 in a constructive trust, and (2) finding that Gaffney breached her duties as the personal representative by failing to provide documentation to Uleman and in removing her as personal representative.

## STANDARD OF REVIEW

An action to impose a constructive trust sounds in equity, which an appellate court reviews de novo on the record, giving consideration, where the evidence is in conflict, to the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of facts rather than the opposite. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

The removal of a personal representative is reviewed for error appearing on the record. *In re Estate of Robb*, 21 Neb. App. 429, 839 N.W.2d 368 (2013).

Appeals of matters arising under the Nebraska Probate Code are reviewed for error on the record. *In re Estate of Graham*, 301 Neb. 594, 919 N.W.2d 714 (2018). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*. When reviewing a decision of the probate court, the appellate court does not reweigh the evidence and must consider the evidence in the light most favorable to the successful party, who is entitled to every reasonable inference available from the evidence. *Id*.

## ANALYSIS

*Breach of Power of Attorney and Constructive Trust.*

Gaffney argues that the county court erred in finding that she had breached the duties of her power of attorney by placing funds in the UBS joint account and in ordering her to pay, and imposing a constructive trust on, the sum of $114,677.07. We disagree.

In 2012, Nebraska enacted the Nebraska Uniform Power of Attorney Act. Neb. Rev. Stat. § 30-4001 et seq. (NUPOAA). Prior to the NUPOAA, an agent could gift to him or herself only if the power of attorney document contained a specific grant of authority to do so, and there was a clear intent on the part of the principal to make the gift. See *Crosby v. Luehrs*, 266 Neb. 827, 669 N.W.2d 635 (2003). Under the NUPOAA, however, this prohibition was removed for an agent who is an ancestor, spouse, or issue of the principal who has general gifting authority. See, Neb.

Rev. Stat. § 30-4024(2) (Reissue 2016); Unif. Power of Attorney Act. § 402, 88 U.L.A. 262 (2014). But Neb. Rev. Stat. § 30-4014(1)(c) (Reissue 2016) imposes upon an agent the duty to act only within the scope of the authority granted, or reasonably implied by, the grant of authority in the power of attorney. Here, the power of attorney specifically prohibited Gaffney from using her authority to make a gift to herself, unless there was specific authority or special instructions permitting it. As such, case law analyzing the establishment of a constructive trust resulting from unauthorized gifting under a power of attorney prior to the adoption of the NUPOAA remains instructive.

In situations involving an attorney in fact, a prima facie case of constructive fraud is established if the plaintiff shows that the defendant held the principal's power of attorney and that the defendant, using the power of attorney, made an unauthorized gift to himself or herself. See *Eggleston v. Kovacich*, 274 Neb. 579, 742 N.W.2d 471 (2007). Whether the fiduciary acted in good faith or had actual intent to defraud is immaterial; when these circumstances are shown, the law presumes constructive fraud. *Litherland v. Jurgens*, 291 Neb. 775, 869 N.W.2d 92 (2015). An agent or other fiduciary who deals with the subject matter of the agency so as to make a profit for himself or herself will be held to account in equity as trustee for all profits and advantages acquired by him or her in such dealings. *Id*.

A fiduciary's acquisition of a right of survivorship in property, even absent a present possessory interest, is generally sufficient to establish that a fiduciary has profited from a transaction. *Eggleston v. Kovacich, supra.* The burden of going forward under such circumstances falls upon the defendant to establish by clear and convincing evidence that the transaction was made pursuant to power expressly granted in the power of attorney document and made pursuant to clear intent of the donor. *Id*. The fiduciary bears the burden of proving the fairness of the transaction. *Id*.

The basic policy concern underlying the law that forbids self-dealing is not linked to any duty an agent may have to third parties, but is primarily addressed to the potential for fraud that exists when an agent acting pursuant to a durable power of attorney has the power to make gifts, especially after the principal becomes incapacitated. *In re Estate of Adelung*, 306 Neb. 646, 947 N.W.2d 269 (2020).

Because the NUPOAA does not require an express grant of authority for an agent who is an issue of the principal to gift to him or herself, Gaffney's transfer of the proceeds to a joint account may have been permissible if Lahr's power of attorney was silent on the issue of gifting. See § 30-4024(2). However, Lahr's power of attorney was not silent on the matter. It explicitly stated that Gaffney would need specific authority to make a gift to herself.

Lahr's 2020 power of attorney document stated:

Except as otherwise authorized by the Power of Personal and Family Maintenance, an agent MAY NOT use my property to benefit the agent or a person to whom the agent owes an obligation of support unless I have included that authority in the Special Instructions or the Grant of Specific Authority.

(Emphasis in original.) There were no special instructions listed in the document, nor was there any grant of specific authority. Thus, under the power of attorney, Gaffney did not have the authority to make a gift to herself.

While there was no clear evidence presented regarding whether Lahr directed the UBS account to be a joint account with rights of survivorship, there was clear evidence that Gaffney, utilizing the power of attorney, removed the sale proceeds from Lahr's preexisting checking account to the newly created UBS joint bank account in which she had rights of survivorship. Gaffney testified that she wrote the check to UBS and signed Lahr's name, although she did not note on the check that she was signing as power of attorney. Gaffney used the power of attorney to move funds from Lahr's sole checking account into the joint UBS account in which she had rights of survivorship, thus making a gift to herself. This was expressly prohibited by the power of attorney document.

The evidence was sufficient to establish that Gaffney obtained title to the proceeds of the house, whether intentional or not, by abusing her authority under Lahr's power of attorney. The remedy in such a case is to place the property at issue in a constructive trust.

A party seeking to establish a constructive trust must prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained. *Stehlik v. Rakosnik*, 24 Neb. App. 34, 881 N.W.2d 1 (2016).

Gaffney's use of the power of attorney to transfer funds from Lahr's sole checking account to the joint UBS account constitutes an abuse of confidential relationship. It resulted in an unequal division of Lahr's estate, contrary to Lahr's express intention in her will to have her estate equally divided between Gaffney and Uleman. Under the rules of equity and good conscience, Gaffney should not be allowed to profit from her acts and the county court did not err in finding that Gaffney had breached her duty under the power of attorney, nor in placing the funds in a constructive trust.

We note Gaffney argues that if a constructive trust is imposed, the amount should not exceed one-half of $149,462.12, which was the amount in the UBS joint account. The county court ordered that Gaffney return $114,677.07 to the successor trustee, which represents one-half of the estate value as reflected on the inheritance tax worksheet. Because the amount ordered equals the amount Gaffney identified as each daughter's share, and the final distribution is to be made upon further order of the court, we decline to modify the amount ordered.

*Breach of Duties and Removal as Personal Representative.*

Gaffney argues the county court erred in finding that she breached her duties as personal representative of the estate by failing to provide documentation to Uleman and in removing her as personal representative of the estate. We find no error in the court's decisions.

Cause for removal of a personal representative exists when removal would be in the best interests of the estate, or if it is shown that the personal representative has mismanaged the estate or failed to perform any duty pertaining to the office. See *In re Estate of Webb*, 20 Neb. App. 12, 817 N.W.2d 304 (2012).

In its order, the county court noted that Gaffney kept financial records from Uleman, which concealed the issue with the funds in the UBS joint account. It also found she failed to respond to Uleman's reasonable requests for documentation. We note that in addition to these facts, Gaffney's filings represented to the county court that the funds in the UBS account would be shared equally between Gaffney and Uleman. The estate tax worksheet reflected that the estate, including the

UBS joint account, would be divided equally between Gaffney and Uleman, and it attributed the estate tax to the parties equally. This material misrepresentation to the court was also a breach of Gaffney's duties as personal representative.

Gaffney materially mispresented the distribution of the estate in filings with the court, and she failed to perform her duties as personal representative to provide documentation to Uleman. Based on this record, the county court did not err in finding that Gaffney breached her duty as personal representative of the estate; consequently, it did not err in removing her as personal representative.

## CONCLUSION

We find that the county court did not err in concluding that Gaffney had breached her duty as Lahr's power of attorney, or in establishing a constructive trust over the $114,677.07. The county court did not err in finding that Gaffney had breached her duty as the personal representative of the estate, or in removing her as personal representative. We affirm the judgment of the county court.

AFFIRMED.